RUSSIAN ORTHODOX GREEK CATHOLIC ALL SAINTS CHURCH *vs.* JOHN S. KEDROVSKY ET AL.

First Judicial District, Hartford, May Term, 1931.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued May 7th—decided October 23d, 1931.

*George E. Beers,* with whom was *Roger Wolcott Davis,* for the appellant (plaintiff).

*Frederic J. Corbett,* for the appellee (defendant The First Russian Greek Catholic All Saints Church, Inc.).

MALTBIE, C. J.  The plaintiff brought this action to settle the title to certain premises with a church building thereon in the city of Hartford.  The complaint substantially follows the form ordinarily used in actions of this nature and alleges that the plaintiff, a voluntary association, is the rightful owner of the premises.  At the trial its claim was that the title to the property is in it and its officers, subject only to the trust that it be used for services of the Russian Orthodox Greek Catholic Church conducted by it as a parish under Platon Rojdesvensky, the ruling archbishop of the diocese.  The plaintiff therefore claims the legal title to the property.  But the facts stated in the finding fail, as the trial court concluded, to show that it has such title.  It is found that in 1914 a parish of the church, organized as a voluntary association, acquired the property in question, the title being conveyed to Alexander Nemelovsky, his successors and assigns, he being at that time the undisputed archbishop of the diocese or mission of the Aleutian Islands and North America.  Subsequently Archbishop Nemelovsky conveyed to trustees all the real estate of the church in the diocese, including the premises in question.  This deed defined at considerable length the terms of the trust upon which the property was to be held.  Subsequently the plaintiff brought an action in the City Court of the city of Hartford against the

trustees to compel them to execute and deliver to its trustees a deed of the property and for other equitable relief. The defendant corporation was not a party to this action and had no notice of it. Judgment was entered for the plaintiff, in effect *pro confesso,* that the defendants in the suit execute a deed of the property substantially as prayed in the complaint and that if they failed to do so, they should be forever barred of all equity in the premises and title to them should vest in the plaintiff free of all claims on their part. No such deed was executed and the decree was recorded in the land records of the town. We have recognized in this State that, in equity, a charitable devise to an unincorporated association may be protected and given effect. *Brinsmade* v. *Beach,* 98 Conn. 322, 332, 119 Atl. 233. But it is our law that a voluntary association, even when organized for religious purposes, has not the capacity to hold the legal title to real estate. *Greene* v. *Dennis,* 6 Conn. 292; *East Haddam Baptist Church* v. *East Haddam Baptist Society,* 44 Conn. 259. In the last case we said (p. 260): "It is obvious from this statement of the case that the allegation of title is essential to the cause of action. If the petitioners have no title they have no standing in court. It will be observed that they do not come into court as individuals having an equitable interest in the property, seeking the aid of a court of chancery to enforce a trust and carry out the intention of the donors, but they come claiming to be the absolute owners, not only of an equitable interest, but of the legal title. The report of the committee shows that the petitioners are not a corporation but a voluntary association. As such they are not the legal owners of the property in question, and by the laws of this State cannot own real estate." As the plaintiff was without capacity to hold the legal title of the

premises, the decree of the City Court was ineffective to vest such a title in it. The only other claim of title which the plaintiff advances is that it is a continuation of the original voluntary association which purchased the property. But as this association never had legal title to the property, this claim cannot of course prevail.

This conclusion is sufficient to sustain the trial court in its decision and we might with propriety go no further. But the case has been long pending in the courts, has been fully tried, and the trial court has reviewed the facts with care and assiduity, tracing the history not only of the plaintiff and defendant organizations, but also of the Russian Greek Orthodox Catholic Church in general since its disruption as a result of the Russian Revolution. The real issue is not so much that of legal title to the premises in question as it is that of the right of the plaintiff to control them and their use. Under the laws of the Russian Orthodox Greek Catholic Church a parish is stated to be "an association of Orthodox Christians composed of the clergy and laity living in a definite locality and united around a temple, forming part of a diocese, under the canonical administration of the diocesan Bishop and under the guidance of a Rector appointed by the latter." Directions are given in those laws for the organization of the parish by the choice of certain officers and a parish council and by provisions for parish meetings. All church property is divided into two classes: that of the church includes the church building and its appurtenances, while property devoted to the religio-educational and charitable needs of the parish is designated as parochial property. The control and management of the church building is vested in the parish meeting and the parish council. The real question comes then to this, Has the plaintiff

association and its officers the right to represent the parish in the control and management of the building in question?

The Russian Orthodox Greek Catholic Church, according to the Eastern Confession, is one of the seven patriarchates of the Eastern Orthodox Church. It is normally governed by a Patriarch, Sacred Synod and a Supreme Church Council, subject to the supreme authority of the sobor or general convocation, which is composed of bishops, clergymen and laymen. It is one of the great churches professing to believe in the apostolic succession through a separate order of the ministry, which succession is regarded as a fundamental and absolutely indispensable feature of the church doctrine. It has been conservative to the highest degree and extremely tenacious of all matters of ancient doctrine and discipline. It holds that the true faith is the one "once and for all delivered unto the saints" and this faith and the church authority are passed down through the line of bishops, in whom reside all truth and sacerdotal authority. They alone have power to perpetuate the ministry in its various forms and allegiance to the bishops is of the very essence of the existence of a parish.

As a result of the Russian Revolution it became impossible to continue the Church government in accordance with its established canons and a resolution was adopted by the Church authorities making provision for carrying on the Church. This contained among other provisions a direction to the diocesan bishops, in the event that the Sacred Synod and Supreme Church Council should stop their activities, to apply directly to the Patriarch or to such persons or institutions as he should direct, for guidance in the determination of such matters as would ordinarily come up before those bodies; and if both the supreme

church administration and the Patriarch should cease their activities, then the diocesan bishops were to get in touch with the bishops of the neighboring dioceses for the establishment of a supreme church power for the several dioceses under similar conditions. A number of bishops of Russian dioceses organized a council of bishops and a supreme church administration located first in southern Russia and later at Karlovtzi, Serbia; and while at one time this organization was adjudged by the Patriarch to have no canonical standing and its dissolution was decreed, it was reorganized and has since continued its activities. There are now in this country three high church dignitaries who claim the right to supreme authority in the diocese. One is John S. Kedrovsky, who claims to be Archbishop and Metropolitan by virtue of a consecration and appointment by the "Living Church," established by a sobor of the Church held in 1923, which is universally understood to be under Bolshevik tutelage and control. Another is Platon Rojdesvensky, who was first named informally by the Patriarch and then confirmed by the Karlovtzi synod and council as ruling the diocese under a temporary appointment, and who was also designated as a permanent appointee in a letter from the Patriarch; but who was removed from office by the Karlovtzi synod in 1927. He was also recognized and confirmed as archbishop at a sobor of the North American diocese held at Detroit in 1924, in which the Russian Orthodox diocese in America was declared to be a self-ruling church, to be ruled by elected archbishops, although still recognizing the spiritual ties with the Russian Church and acknowledging the Patriarch as head of the mother church. Finally there is Archbishop Appolinary, who had been vicar bishop of San Francisco and was appointed archbishop and placed in charge of the diocese by the

Karlovtzi synod after the removal from office of Archbishop Rojdesvensky. Both the plaintiff and the defendant corporation now repudiate Kedrovsky's pretensions; the plaintiff recognizes the right and authority of Archbishop Rojdesvensky, its priest having been appointed and its church committee confirmed by him, but the defendant church refuses to recognize him, holding that his permanent appointment by the Patriarch was beyond his authority. The defendant church does recognize the authority of Archbishop Appolinary.

Previous to 1921 the original voluntary association had occupied the premises and conducted services there. In that year, under the influence and leadership of its then priest Kozuboff, a special meeting of the parish was held and it was unanimously voted to incorporate the church under the laws of this State. Accordingly the defendant corporation was formed, not under any law concerning ecclesiastical corporations, but under the law governing corporations without capital stock in general. It thereafter adopted by-laws which provided as the necessary qualification for membership a belief in the doctrines of the "Greek Catholic Orthodox Church" and also that the corporation and the church should have full contact with the "Russian Orthodox Holy Synod"; but that the church should be a distinct entity not under the control of any other church or mission "and especially that of the Russian Mission of America, or of the Christian Orthodox Greek Catholic Church, or Archbishop Alexander [Nemelovsky], or Metropolitan or Eczarch Platon"; and the form of organization established by these by-laws did not in certain respects accord with the polity of the Church general. Kedrovsky succeeded Kozuboff as priest and conducted the services in an unseemly manner and appointed unfit persons

to office. After he received his appointment as archbishop he made a deed of the premises to the church in that capacity and this deed was stated to be upon the express condition that the defendant corporation should recognize his religious and spiritual authority. The defendant did recognize that authority in a general way, although from time to time repudiating it, and recognized no other archbishop until 1930. On March 9th, 1930, a special meeting of the defendant corporation was held and it was voted to "take another Bishop" in place of Kedrovsky and "they all agreed to go under the jurisdiction of the lawful ruling Orthodox Bishop Appolinary, who represents the Holy Russian Sinod over broad." New by-laws were then adopted. One of these provides as follows: "This Corporation and Congregation shall unchangeably recognize all the dogmas of the Holy Orthodox Eastern Church, canons and precepts of the Holy Apostles, of the seven Œcumenical Councils, . . . being in full canonical communion with the Russian Orthodox Patriarch, his Synod and Supreme Ecclesiastical Council; and temporarily, pending the restoration of normal conditions of Church life in Russia, it shall be under the jurisdiction and subjection to the Holy Russian Orthodox Synod of Bishops Abroad, in the person of their lawful representative in America, the Archbishop of North America and Canada." The church now has a priest appointed by Archbishop Appolinary. It has from its organization continued to occupy the premises, has from time to time elected parish officers in accordance with the canons of the Russian Orthodox Greek Catholic Church and has at all times conducted its services and followed a ritual in accordance with the faith of that Church. It has one hundred and ninety-three members, who, with their families, attend its services, some of whom were

among those who originally organized the church and others of whom have since joined.

The plaintiff association had its origin in 1923 or 1924 when a few persons, dissatisfied with the conduct and standing of the church of the original association, began to meet elsewhere. It has apparently possessed a separate organization at all times since. It now has thirty-eight members, who, with their families, attend its services. Of these only six were members of the original association. It is in charge of a priest expressly recognized by Archbishop Rojdesvensky and of officers confirmed by him.

Ordinarily where there is a schism in a member of an associated church body such as the Russian Orthodox Greek Catholic Church, the rule to determine which division will be accorded the higher right is thus stated: " 'The title to the church property of a divided congregation is in that part of it which is acting in harmony with its own law, and the ecclesiastical laws, usages, customs, and principles which were accepted among them before the dispute began, are the standard for determining which party is right.' " Zollmann, American Civil Church Law (77 Columbia University Studies) 182; *Smith* v. *Pedigo,* 145 Ind. 361, 375, 33 N. E. 777, 44 N. E. 363; *True Reformed Dutch Church* v. *Iserman,* 64 N. J. L. 506, 45 Atl. 771; *Barton* v. *Fitzpatrick,* 187 Ala. 273, 65 So. 390. Had the church body represented by the defendant corporation persisted in its attempt to establish a distinct church and its repudiation of the higher authorities of the Church general there can be little question that it would have forfeited its right to be regarded as a member of that Church. The members of that body were, however, ignorant and uneducated laymen, not versed in canonical law and were led astray by Kozuboff and Kedrovsky. It has now reasserted its

allegiance to the Church general and recognized the authority of one who claims to be its representative in the rule of the diocese. The present relationship of its adherents to the Church general is not to be questioned "by digging up their personal faults in the past or spreading upon the record their inconsistencies in church relationship." *Mason* v. *Hickman*, 4 Ky. L. Rep. 313, 317.

Looking at the two parties before us it is evident that now there is no great distinction to be drawn between them upon the score of religious faith. Both profess to accept the religious tenets and follow the ritual of the Russian Orthodox Greek Catholic Church in general. Both hold true to the doctrine of apostolic succession, one recognizing the authority of Archbishop Rojdesvensky, the other that of Archbishop Appolinary, both of whom hold the position of Bishop in unquestionable right, the former by reason of his original appointment as archbishop before the Russian Revolution and the other, because he held rightfully at least the position of vicar bishop, which gave him complete canonical standing as a bishop, though without power to rule over a diocese. The vital difference between the two consists of little more than this: One recognizes the right of Archbishop Rojdesvensky to rule the diocese and the other, that of Archbishop Appolinary. As far as the former is concerned, his appointment by the Karlovtzi synod having become ineffective by his removal from office by that body, he can only claim under his permanent appointment by the Patriarch. By the laws of the church the Patriarch is given charge of "filling in due time the vacant chairs of diocesan bishops," but the full provisions elsewhere made in these laws for the choice of bishops by election by other bishops, the Sacred Synod or the Supreme Church Authority, indicate clearly

that the Patriarch has no power by himself to make a permanent appointment of an archbishop to have charge of a diocese. Moreover, the connection of Archbishop Rojdesvensky with the Detroit sobor, which was attempting a virtual separation of the American branch of the church implicates him in a movement hostile to the continuance of the established organization of the Church general. On the other hand, the Karlovtzi synod is attempting to carry out as best it may in view of the disruption of the Church a central organization representing the traditional polity of the Church, and it is the only body which apparently is attempting to do this. Allegiance to that body by any branch of the Church goes as far toward preservation of the unity of the Church general as it is now possible to go. One can only hope and expect that the present situation of the Church marks a transitional period, out of which will ultimately emerge a settled form of organization in accordance with its traditional polity. In the meantime the plaintiff association has failed to show any higher right to represent the parish in the management and control of the church property than the defendant corporation has.

In the view we take of the case the ruling upon evidence of which complaint is made is not of consequence.

There is no error.

In this opinion the other judges concurred.