Malanchuk et al., Appellants, *v.* St. Mary's Greek Catholic Church of McKees Rocks et al.

Argued September 27, 1939.  Before KEPHART, C. J., SCHAFFER, MAXEY, LINN, STERN and BARNES, JJ.

·*Thomas F. Garrahan*, with him *Francis Taptich*, for appellants.

*W. W. Stoner*, with him *J. M. Stoner & Sons, John A. Metz, David Friedman* and *John A. Metz, Jr.*, for appellees.

OPINION BY MR. JUSTICE MAXEY, November 27, 1939:

The appellants are members of St. Mary's Greek Catholic Church of McKees Rocks (hereinafter referred to as St. Mary's Church). On March 3, 1937, they filed a bill in equity to restrain the officers of that church from interfering with Rev. Peter Oleksiw in the performance of his duties "as the regularly appointed pastor of said church, and from installing any other person as pastor of said church." They asked the court to direct the defendants to maintain and keep the property of that church for the worship of God according to the principles, doctrines and usages of that body of Christian worshippers known as the Greek Catholic Church in union with the Holy See, and subject to the ecclesiastical laws, discipline and government of that church, and to restrain the diversion of the church property by the defendants from its dedicated purposes and uses. Defendants filed an answer setting forth that the church in controversy was not founded as a Greek Catholic Church united with the Roman Catholic Church, to wit, a Uniate Greek Catholic Church, but, on the contrary, was founded as a Greek Catholic Church independent of all ecclesiastical authority other than the congregation itself and intended as a church where all Greek

Catholics of any affiliation, i. e., Uniate or non-Uniate, could worship together according to their common Eastern or Oriental Rite; and that the Uniate Greek Catholic Bishop had therefore no jurisdiction or authority to appoint a priest to the church, and asked that the bill be dismissed. A hearing was held and a decree nisi, supported by findings of fact and conclusions of law, was entered, dismissing the bill, at the costs of the plaintiffs. Exceptions were filed and after argument, were overruled, and the final decree was made dismissing the bill. This appeal followed.

It appears from the record that the term "Greek Catholic Church" is a generic term embracing three classes of churches as follows: (1) Orthodox Greek Catholic Churches, to wit: Greek Catholic Churches under the ecclesiastical jurisdiction of one or another of the Patriarchates, i. e., the Patriarchate of Russia, or the Patriarchate of Antioch, or some other place; (2) Uniate Greek Catholic Churches, to wit: those united with and recognizing the ecclesiastical supremacy of the Pope of Rome; and (3) the independent or autocephalous Greek Catholic Churches of the East not under the ecclesiastical jurisdiction of any of the Patriarchates nor of the Pope of Rome. The common feature of all of these churches is the fact that in all of them the Mass is celebrated according to the Eastern or Oriental Rite as distinguished from the Latin Rite of the Roman Catholic Church.

The court below made 63 findings of fact. Among them are the following: "(2) That the defendant, St. Mary's Greek Catholic Church . . . is a corporation of the first class, incorporated under the laws of the Commonwealth of Pennsylvania, on October 27, 1906, . . . (5) That the Pope . . . duly appointed in 1907 the Rev. Soter Ortynski Bishop of the Greek Catholic Church in the Diocese of the United States of America, giving him jurisdiction over all Greek Catholic Churches in the United States in Union with the Holy See. . . . He

was succeeded by Administrator Poynatician, who served from 1916 to 1924, and he, in turn, was succeeded on May 8, 1924, by the Rev. Constantine Bohachevsky, the present Bishop. (6) That on or about February 17, 1937, . . . Bishop Bohachevsky . . . appointed as pastor of St. Mary's Church . . . the Very Rev. Peter Oleksiw, who, acting upon said letter of appointment, thereupon presented himself to the individual defendants and requested that the church and parish house be turned over to him and that he be permitted to act as priest" of that church. This request was refused. The 13th finding is that on June 17, 1906, a meeting was held by from 34 to 60 Galicians, then residents of McKees Rocks, that among those in attendance were members of the Greek Church affiliated with Rome and others were members of a Greek Church not affiliated with Rome. It was decided at this meeting to organize the St. Mary's Church and Rev. Stefanovich was requested to secure a charter. Funds raised for this purpose consisted of contributions made by those who attended an Orthodox Church in Pittsburgh and those who attended a Uniate Church in Pittsburgh. A church costing $2,400 was erected with money collected by both the Orthodox and the Uniate groups. The 14th finding is that a charter was secured and the purpose of the corporation as set forth in the charter, was as follows: ". . . Is the support of the public worship of Almighty God, according to the forms, principles, doctrine and usages of that body of Christian worshippers known as the Greek Catholic Church." The charter further provided that "the oversight and management of all matters relating to the temporal affairs of the church shall be vested in a Board of Directors, consisting of a President, Vice President, Recording Secretary, Financial Secretary, Treasurer and Six Trustees, all of whom shall be lay members" of the Greek Catholic Church and shall be elected at a meeting to be held annually. (16). That it was the agreement of the persons attending the or-

ganization meeting "that there should be organized a Greek Catholic Church where all could attend; that the church was not to be under the Pope of Rome; that if the priest to be secured came from the Greek Catholic Church in Union with Rome, then the cantor, or teacher, was to come from that Greek Catholic Church which was Orthodox, but, on the contrary, if the priest was to be secured from that Greek Catholic Church that was Orthodox, then the cantor was to be secured from the Greek Catholic Church that was in Union with Rome." The 17th finding is that St. Mary's Church was to be attended by members of both groups, i. e., the Orthodox group and the Uniate group of the Greek Catholic Churches. (18) That as a priest for the new St. Mary's Church, they were to accept a priest to be secured by the Rev. Nicholas Stefanovich, who, thereupon, communicated with a Uniate priest in Galicia, Rev. Peter Luchechko. The latter came to this country and acted as the priest of the parish. The members of the parish voted his salary and provided a dwelling for him. "He was secured by Rev. Stefanovich without designation by any Bishop or representative of any Uniate Diocese; that his acceptance of the place with St. Mary's Church did not have the approval, sanction or appointment of Rev. Canevin, Bishop of the Roman Catholic Church, in whose territory St. Mary's Church was established." The 20th finding is that on January 7, 1907, the first service was held in St. Mary's Church, with a priest affiliated with Rome officiating. "(21) . . . The organizers or members of St. Mary's . . . Church . . . did not seek, nor did they secure permission in writing from the Roman Catholic Bishop in the Pittsburgh Diocese, who, under the Canon Law, was at that time Ordinary over the Greek Catholic Churches in Union with Rome within this territory, to erect the church, as is required by Canon '1162' [of the Roman Catholic Church]. 22. That on January 7, 1907, and prior thereto, the organizers or members of St. Mary's . . . Church . . . dedi-

cated the new church in honor of St. Mary, a beatified person, without seeking or securing permission from the Holy See, contrary to the provisions of Canon '1168'. (23) That on January 7, 1907 . . . the organizers . . ., by holding divine service therein, dedicated the altar of the church to St. Mary, a blessed person, without securing permission by an indult of the Apostolic See, as is required by Canon '1201'. (24) That on January 7, 1907, . . . the organizers . . . had failed to secure the consecration or blessing of the church, in accordance with the requirements of Canon '1155' . . . (25) That on January 7, 1907, . . . Holy Mass was celebrated in the church building . . . without the church having first been consecrated or blessed, in accordance with Canon '1165'." (26) At the same time Holy Mass was celebrated on the immovable altar of this church without the altar having been consecrated in accordance with Canon Law "1199". (27) "That there is no evidence to show that a document attesting to the fact of the consecration or blessing of St. Mary's . . . Church . . . was ever drawn up, that any copy thereof was ever deposited in the episcopal Curia, or any kept in the archives of the church, as is required by Canon '1158'. (28) That there is no evidence to show that . . . at the time of the dedication of the church, . . . any corner-stone of the church building had been laid, in accordance with the provisions of Canon '1163'. (29) That there is no evidence to show that the bells of the church were ever consecrated or blessed, in accordance with Canon '1169'. . . . (31) That on November 17, 1907, the parishioners of St. Mary's . . . Church . . . 'approved the action of the New York Convention of Greek Catholic American parishes touching the support of the Bishop, and recognized for their Greek Catholic Bishop the Rt. Rev. Soter Ortynsky,' " and agreed that 5% from church income from October 1, 1907, be placed in the hands of this Bishop. The 33rd finding is that subsequent to the recognition of Rev. Ortynsky as Bishop, St. Mary's

Church was conducted in a manner in many regards similar to that in which churches of the Greek Catholic Rite in Union with Rome are conducted in accordance with Canonical Law. The court below then specified many examples of this.

The 35th finding of fact is "that the congregation of St. Mary's . . . Church . . . refused to approve on at least two definite occasions, and by a consistent course of conduct, the diocesan by-laws, the adoption of which is, under the discipline and government of Greek Catholic churches in Union with Rome, necessary and obligatory." (36) That the congregation of this church removed in 1928 Rev. Soldat, a priest who had been appointed by Rev. Bohachevsky, without consultation with the diocesan office in Philadelphia. (37) That on January 2, 1927, the members of this church "unanimously adopted a resolution against Very Rev. Constatine Bohachevsky and declared their intention to pay him nothing." (39) That on or about May 4, 1927, the members of this church voted to take the property back from the Bishop by a unanimous vote, there being 201 votes for this action and none against it. The 40th finding of fact is that on October 5, 1927, a bill in equity was filed on behalf of the membership of this church against Bishop Bohachevsky, praying the Court of Common Pleas of Allegheny County, to direct a reconveyance by Bishop Bohachevsky to St. Mary's Church, of the property, title to which was then held in his name. No defense was made to this action and the decree was entered. (42) Pursuant to this decree the property was reconveyed to St. Mary's Greek Catholic Church of McKees Rocks, Pa. (43) Since January, 1927, until 1937, there has been no recognition by this church "of any connection, affiliation or subordination relative to the Holy See". (44) That never since 1927 has the congregation of this church paid any money directly or indirectly to the Greek Catholic Diocese in Union with Rome, for cathedraticum, Peter's pence, orphan's collection, missions,

the maintenance of the seminary, or for any other purpose. (48) That on April 28, 1928, St. Mary's Church voted a contract to the Rev. Kulmatseky, the latter having declared his willingness to serve the congregation without the appointment of the Bishop. The 49th finding sets forth that thereafter Rev. Kulmatseky announced to the congregation that he had been suspended by the Bishop. (50) That after his suspension by the Bishop he continued to serve the parish until his removal in 1937. (51) That despite the suspension of Rev. Kulmatseky there was no dissension within the membership of this church and that all of the complainants in the present bill, with perhaps one or two exceptions, and all of the witnesses called on behalf of the complainants continued to attend this church. (52) That during the pastorate of Rev. Kulmatseky the congregation, including the complainants, improved the church and expended more than $28,000 on its maintenance, repair, replacements and improvements. The 53rd and 54th findings are that a little later Rev. Kulmatseky was removed for failure to account for church funds and Rev. Dynutra Senata, the present incumbent, was secured as pastor.

The 56th finding is that Rev. Vladimir Chzozriz, pastor of the Uniate Church in the North Side of Pittsburgh, was anxious to secure appointment to St. Mary's Church; that he had interviewed various officers of the latter congregation in an effort to secure their favor in his behalf; that he entered an understanding with Rev. Kulmatseky whereby they would, if the Bishop's consent could be secured, exchange parishes; that on January 23, 1937, Rev. Michael Kindey and Reverends Chzozriz and Kulmatseky met in St. Mary's church, without notice to the membership of this church; that then and there Rev. Kulmatseky confessed, signed papers of reconciliation and was, by Rev. Kindey, who acted for and on behalf of Bishop Bohachevsky, reunited with the Greek Catholic Church in Union with Rome as

a priest of the diocese; that, thereafter, the three proceeded to the altar and there Rev. Kindey re-consecrated St. Mary's Greek Catholic Church to the Holy See and accepted once more the church for and on behalf of the Bishop; and that on January 24, 1937, Rev. Kulmatseky went to the parish of Rev. Chzozriz, on the North Side, to hold mass.

The 57th and 58th findings of fact are that on January 24, 1937, there appeared for celebration of mass at St. Mary's Church the Rev. Alexander Pyk, at that time Chancellor to Bishop Bohachevsky, and the Rev. Chzozriz, and that at the conclusion of the celebration of mass, during which the congregation learned for the first time from Rev. Pyk of the appointment of Rev. Chzozriz by Bishop Bohachevsky as their priest, a meeting was held in the hall of the parish, and that at this meeting Rev. Pyk informed the members of this church that the diocesan office had been told by Rev. Kulmatseky that the church desired to be reunited with the Bishop; that the members "thereupon overwhelmingly shouted down the proposal with loud and vehement noes"; and that Rev. Pyk thereupon apologized and expressed his regret and sorrow at having come to them under a misapprehension of their wishes, and he subsequently left with Rev. Chzozriz. (59) That subsequent to that meeting Bishop Bohachevsky appointed Rev. Peter Oleksiw, who proceeded to McKees Rocks, presented his appointment, attempted to establish himself as parish priest and was denied that privilege by the members and officers of this parish. (60) That the antimins on the altar at the time Rev. Kulmatseky and the present priest Rev. Senata celebrated mass was not the antimins signed by the Rev. Ortynski, but a new and different antimins bearing the signature of an independent Bishop having no connection with the Greek Catholic Church in Union with Rome. (61) That the term "Greek Catholic Church," when and as used in connection with the founding of St. Mary's Church, with the application for the grant-

ing of a charter for this church, on and before January 7, 1907, was a generic term, meaning either "Greek Catholic Church Orthodox" or a "Greek Catholic Church in Union with Rome." (62) That never since 1928, until the attempted appointment by Bishop Bohachevsky of Rev. Chzozriz and Rev. Oleksiw, has Bishop Bohachevsky attempted directly or indirectly to communicate with St. Mary's Church, nor has he attempted to exercise any authority, discipline, control or regulation over this church, its priests, or the members of the parish. (63) That Bishop Bohachevsky is not a party to the present proceedings, has not directly or indirectly indicated any interest therein, appeared as a witness, or designated anyone to appear for or on his behalf either as a witness or as a party of record.

The court below aptly says that "the issue in this case is comparatively simple. . . . The question presented is the determination of the kind and character of the church organized and dedicated to the worship of God on January 7, 1907. . . . It is the opinion of the Chancellor, after a careful and exhaustive examination of the voluminous record, that the persons who gathered together [at the organization meeting], representing both those who attended the Uniate Church, on the South Side [of Pittsburgh] and the Orthodox Church, on the North Side [of Pittsburgh], intended to organize a new church where they might worship Almighty God according to the Oriental ritual and rite. . . . It is our opinion they were not acquainted with, had no knowledge of, and did not consider questions of ecclesiastical affiliation, and that they did not understand, and not understanding gave no thought to, the difference between Uniate and Orthodox churches. It was the testimony of many that, so far as they could determine, mass was celebrated in identically the same manner in either church." The Chancellor further set forth that he "was impressed throughout the five weeks of the trial of this case with the respectful conduct of the members of this

parish in attendance upon the trial and with the manifest reverence they demonstrated toward matters of religion and fundamental belief. . . . They have progressed from a small wooden church to a representative church in which they take great pride. They have walked humbly together in the sight of God and man and have lived in peace and harmony with each other until the present action in 1937, which was brought by a small group of the friends of the deposed Rev. Dennis Kulmatseky, who are the complainants in the present bill. Not only is it true that at the time of the celebration of the first mass, in this church, January 7, 1907, that the members of the parish as then constituted had no intention of organizing a Greek Catholic Church in Union with Rome, or a Greek Catholic Church Orthodox, but merely intended to organize a church where all might jointly worship, but their course of conduct subsequent to that date would strengthen that belief. The first priest was called by the church and invited to act as their pastor. Diocesan by-laws were never adopted, but repeatedly rejected. . . . It is the opinion of the Chancellor that the apparent conformity of the parish of St. Mary's Greek Catholic Church of McKees Rocks, Pa., during the period from 1907 to 1927, with the usages, customs, doctrines and discipline of a Greek Catholic Church in Union with Rome represented nothing more than the attempt on the part of the congregation at that time, in recognition of the Bishop's participation with the congregation in furnishing priests, to affiliate itself with that diocese, to approve the action of other churches in recognizing that diocese, and that the contributions made were made out of a desire to help any worthy and proper causes." The Chancellor adds: "The members of the parish were honored at the visitation from high church dignitaries, but they never lost the independence which made them reject further affiliation with those dignitaries when first they believed it was necessary for the good of the

parish. . . . The Chancellor is of the opinion that they intended to found and establish a church of the people, without Orthodox or Uniate affiliation. . . . . It is most significant," said the Chancellor, "that on the very day of the dedication of the church, its property, the building and the altar therein, there was a complete failure to comply with the Canon Law which must govern Greek Catholic Churches in Union with Rome. It is futile to argue that a church dedicated in direct violation of Canon Law was, nevertheless, dedicated as a church recognizing the Canon Law and obligated to obey each of its vitally important provisions for the creation, erection, dedication, consecration and blessing of a new church."

No rule of practice is more frequently reiterated or more constantly adhered to by this court than the rule that the findings of fact by a chancellor and approved by the court in banc have the force and effect of a verdict of a jury, and will not be disturbed if there is evidence to support them. See *Weiss v. First Nat. Bk. of Scranton*, 321 Pa. 365, 184 A. 451, and *Glenn v. Trees*, 276 Pa. 165, 120 A. 109. In the latter case it was well said by the present Chief Justice: "In certain stages of litigation, passing through different channels of our judicial system, juries and judges of the lower courts, as tryers of fact, must assume full responsibility in finally determining matters submitted through the evidence for their consideration, leaving to the appellate courts the duty of correcting such errors of law or procedure as may appear in the record."

In the instant case the findings of fact are fully sustained by the evidence, both direct and circumstantial. On the pivotal questions as to whether this church was organized and dedicated as a church to be under the jurisdiction of the Roman See and as to whether the property was ever devised by the corporation to officials of the Roman See, several witnesses gave testimony. For example, Frank Sucynski, who was president of

the congregation and who had been a member of the church since 1906, testified that at the organization meeting it was agreed that the church would be neither a Uniate Church nor an Orthodox Church. He said: "It was to have been an independent church." Michael Pravlochak, who was one of the founders of the church, was asked: "When you organized this church . . . state whether or not there was to be any agreement— or there was an agreement whether it was to be under the Pope or not?" He answered: "No, no, not under Pope at all." Theodore Pavlishevsky, another founder of the church, was asked: "Were you present at a meeting where there was a resolution by the congregation of your church, St. Mary's, to deed the property of the church over to the Bishop Ortynski or any other Bishop?" He answered: "We did not recognize the transfer of any property to any Roman church dignitary." Sam Sokol, another witness, was asked: "Do you remember any meeting at which there was a resolution or a motion put to the congregation to sell or deed the property of the church to the Bishop?" His answer was: "Yes, there was that but the people didn't accept that." There was other testimony of the same tenor and purport. The conduct of this congregation and its officers toward the priests that came to the church from time to time was even more persuasive than the direct testimony in support of the contention of the defendants that this church was independent in character from its inception.

The first regular priest of the church came from Galicia at the request of the congregation. Although he was a Uniate Greek Catholic priest, he was not appointed to the pastorate of St. Mary's by any Greek Uniate authority. He was chosen pastor of the church by a vote of the congregation. The congregation first heard him celebrate Mass and then met to decide upon his election and his salary. Later, certain priests were sent to St. Mary's Church by the Uniate Greek Catholic

Bishop in Philadelphia, but the congregation reserved the right of accepting or rejecting by a vote the priest so sent to them. In other words, the Bishop's sending of a priest to the congregation was a suggestion and not a command. The congregation paid deference to the Bishop's position as a Christian prelate but did not recognize his episcopal authority. The congregation of St. Mary's Church on two occasions rejected the Diocesan By-laws enacted by the Uniate Greek Catholic Churches. In 1928 the congregation discharged the last priest sent to it by the Uniate Greek Catholic Bishop and in March of that year the congregation employed under contract a priest educated as a Uniate Greek Catholic priest, who came to the church at the request of the congregation but contrary to the orders of the Uniate Greek Catholic Bishop. This new priest was at once suspended by his Bishop from his functions as a Uniate Greek Catholic. He at once made that fact known to the congregation, but he was neverthless retained for nine years thereafter by the congregation. The subordination and obedience to episcopal authority characteristic of the members of a Uniate Greek Catholic Church were entirely wanting in the congregation of St. Mary's Church.

The Act of June 20, 1935, P. L. 353, provides that no ecclesiastical property devoted to certain religious and church uses shall be diverted from the purposes, uses and trusts to which it has been "bequeathed, devised, or conveyed to any ecclesiastical corporation, bishop, ecclesiastic, or other person, for the use of any church, congregation, or religious society, for or in trust for religious worship," etc., but "the same shall be taken and held subject to the control and disposition of such officers or authorities of such church, congregation, or religious society. . . . Nothing herein contained shall authorize the diversion of any property from the purposes, uses, and trusts to which it may have been heretofore lawfully dedicated, or to which it may hereafter,

consistently herewith, be lawfully dedicated." A church, congregation or religious society claiming church property must prove its right to it under this law. This the plaintiffs failed to do.

That the ritualism of the Greek Uniate Church was to a certain extent followed in religious worship did not amount to a conveyance and dedication of the church property to that church. When an ecclesiastic organization lays down certain canons which must be strictly conformed to by a congregation in order to evidence the latter's subordination, obedience and fealty to the former before that congregation can be recognized as a part of the larger ecclesiastic organization, that congregation does not by merely conducting services which imitate or conform to the ritual of the organization make itself a part of it. In *Dochkus v. Lithuanian Benefit Society of St. Anthony,* 206 Pa. 25, 55 A. 779, this court made it clear that the mere fact that a congregation worships according to the form and rites of a certain church, does not prove that the congregation adhered to and was connected with the ecclesiastical body known as that church or had ever placed itself by any voluntary act of its own under the power of the heads of that church.

To make a church, no matter what its ritual and practices, a Greek Uniate Church there must be certain evidences of its submission to that church's authority, and its dedication as such a church by prescribed forms must be observed. In the annals of St. Mary's Church there is no evidence of such subordination and dedication. This congregation was at no time submissive to the authority of the Uniate Greek Catholic Church. It never organized as a member of that church family. When certain worshipers affiliated with the Greek Orthodox Church of North Pittsburgh and certain worshippers affiliated with the Greek Uniate Church of South Pittsburgh agreed for their convenience in church attendance to organize St. Mary's Church of McKees

Rocks, Pa., which should be open to membership to both groups of worshippers, it was not their intention to make this new church subordinate to the See of Rome. It was an independent congregational church which imitated or adopted much of the ritualism of the Greek Uniate Church to which many of the members were accustomed, but the controlling fact is that the church was organized, incorporated, named, erected and opened for services without compliance in any respect with the requirements of the Roman Catholic Church prescribing what must be done to create a Uniate Greek Catholic Church united with the Church of Rome. That the priests who celebrated Mass in St. Mary's Church at and shortly after its opening were Uniate Greek Catholic priests becomes of no legal significance when the fact is borne in mind that they came *solely at the request of the congregation and without the appointment or sanction of an ecclesiastic authority of the Roman Catholic Church.*

St. Mary's Church of McKees Rocks was in its origin and organization independent of all other ecclesiastical bodies. It was and is a distinct legal entity with property held free from any other control. The title to church property was and is held "subject to the uses, purposes and benefits for which it was given, acquired or devised." See *Canovaro et al., v. Brothers of The Order of Hermits of St. Augustine,* 326 Pa. 76, 91, 191 A. 140. It is significant that in this proceeding no claim is made by the Bishop of the Uniate Greek Catholic Church that St. Mary's Greek Catholic Church of McKees Rocks is subject to the jurisdiction and authority of that mother church.

The conclusion of the court below that the complainants have failed to prove "that St. Mary's Greek Catholic Church of McKees Rocks, Pa., was at the time of its original dedication a Greek Catholic Church in Union with Rome," is correct.

The decree is affirmed at appellants' cost.