INDEPENDENT METHODIST EPISCOPAL CHURCH ET AL. *v.* DANIEL D. DAVIS ET AL.

DANIEL D. DAVIS ET AL. *v.* EDDIE HILL ET AL.

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, Js.

1

Argued March 10—decided May 31, 1950

*Harry L. Nair*, with whom was *Franz J. Carlson*, for the appellants (defendants and plaintiffs).

*Harry Cooper*, with whom was *Frederick J. Rundbaken*, for the appellees (plaintiffs and defendants).

O'SULLIVAN, J. These actions, transferred to the Superior Court from the Court of Common Pleas, are concerned with funds on deposit in Hartford banks and with three parcels of land used for religious purposes. The objective of the first suit, instituted originally against the Reverend Daniel D. Davis, pastor of the Bethel African Methodist Episcopal Church in Hartford, with whom several others were subsequently joined as parties defendant, is to obtain a declaratory judgment determining the ownership of the real and personal property as well as injunctive relief and damages. The second action was brought by Mr. Davis and certain members of his congregation to enjoin six individuals, all of whom are plaintiffs in the first action, from closing the church and preventing its use as a house of worship. Both actions involved the same set of facts. They were referred to a state referee. A remonstrance to his report was overruled and judgment was entered for the plaintiffs in the first case and the defendants in the second. The unsuccessful parties have appealed. In this opinion, the appellants in both instances will be called the defendants and the appellees, the plaintiffs.

4

The referee's report states these facts: The African Methodist Episcopal Church of the United States, which at times will be abbreviated to the A.M.E. Church, was founded in 1816. Its adherents, now approximating one million in number, are resident in Africa and throughout the western hemisphere. The territory is divided into seventeen episcopal districts. Each of them is under the supervision of a bishop who is elected by the supreme governing body of the denomination, known as the General Conference. This conference convenes quadrennially and is composed of the bishops, various ecclesiastics of high and low rank, and lay delegates. The laws which it adopts in its legislative capacity are made known to the faithful through an official publication called the Discipline.

In each episcopal district, an annual conference, over which the bishop presides, is held. Its membership consists of ministerial and lay delegates from the local churches within the district. This geographical area is, in turn, divided into presiding elder districts. At the annual conference, the bishop appoints the presiding elders and the pastors for the various churches within his district; assessments are levied for the support of the national body, referred to as the General Church; the local churches report on their activities and finances, and kindred matters are transacted.

When a religious society desires to be incorporated into the General Church as a full-fledged member, the presiding elder of that particular district delegates an individual to assist in the process. The persons organized as an unaffiliated church then express their intention of becoming a part of the General Church and vote to submit their property and temporal affairs to its control. Subsequently, an authorized representative makes a report to the annual conference for such action as it may deem proper. When a church is ac-

cepted, the Discipline prescribes a ceremony of dedication at which the bishop or presiding elder is presented by the local trustees with the keys of the church in token of a willingness forever to submit to the Discipline, doctrine and government of the A.M.E. Church and to accept the ministry of that faith. The Discipline requires that not less than three nor more than nine trustees shall be elected annually from a group nominated by the pastor and that he shall be chairman of the board and his signature shall be necessary to legalize the acts of the trustees. These local officials are answerable to the bishop and the annual conference with respect to the property and temporal affairs of a regularly connected church.

The Discipline prescribes a form of deed when property is acquired. This form provides for a conveyance in trust forever to the use of members of the A.M.E. Church, according to its rule and Discipline. The practice is for the pastor to take the deed to the annual conference, which may approve it or order modifications therein "so as to firmly secure the premises to the African Methodist Episcopal Church."

Some local churches worshipping in the faith have not made their property subject to the General Church and have only spiritual ties with it. These churches may send representatives to the annual conference. They are not obliged to accept pastors appointed for them, although they usually do.

The A.M.E. Church in Hartford had its origin in 1916 when several persons began to gather to worship together. At first they met informally in various homes. Later they assembled in a hall, and from the outset they followed, in substance, the ritual and form of worship known as African Methodist Episcopal. For a time, services were conducted by one of their own number or, occasionally, by an itinerant preacher. During

1917, the Reverend William Byrd became their first regular preacher.

On December 7, 1917, the group voted to organize in accordance with the statutes of Connecticut under the corporate name of The African Methodist Episcopal Church. A certificate of organization was thereupon filed with the secretary of state together with another certificate which recited that "at a meeting of the ecclesiastical society connected with the African Methodist Episcopal Church, at Hartford, duly warned and held for that purpose, in accordance with the provisions of Chapter 42 of the Public Acts of 1907, on the 7th day of December, 1917, it was voted by a two-thirds vote of the members present, to assign, transfer and convey all of the property, real and personal, and trust funds of said society, to The African Methodist Episcopal Church, a corporation organized under the laws of the State of Connecticut, to be held by said church corporation under and upon the same uses and trusts upon which the same had previously been held by said society," and that such property had been so assigned and transferred.

By warranty deed, devoid of reference to any trust purpose, there was conveyed on December 10, 1917, to "The African Methodist Episcopal Church, a religious corporation, organized and existing under the laws of the State of Connecticut, of said Town of Hartford," a parcel of land known as 180-182 Clark Street. Before incorporating, the founders of the society stated at the church meetings that the property was to be acquired in such a manner as to place its control solely in the local church, independent of the General Church, and the members approved the purchase with that understanding.

Between March, 1922, and June, 1923, and apparently without acting formally to change the name, the

church became known as the Bethel African Methodist Episcopal Church. On June 2, 1923, a second parcel of land, located at 22 Winthrop Street, was conveyed to the church by warranty deed. As with the first, this deed contained no words of trust. It designated the grantee as the Bethel A.M.E. Church of Hartford, which at the time was the only A.M.E. Church in that city. The members intended this property to be bought on the same independent basis as the Clark Street property and understood that this was being done.

From 1918 until 1940 the preachers at the church were appointed by the bishop at the annual conference, and in the latter year the defendant Davis was named and assumed his duties. At this time religious services were being held in the rented basement of another church edifice, as the building on the Winthrop Street property previously utilized as a church had been destroyed by fire in 1938. Shortly after Mr. Davis arrived in Hartford, notice to vacate the basement was received and it became necessary to find other quarters. He talked with the presiding elder, the trustees and others about the matter. As a result, two pieces of available property were taken under consideration, one of them being located at 210 Bellevue Street.

On Sunday, August 18, 1940, Mr. Davis requested the congregation to remain after services to discuss the purchase of a place in which to worship, and at the meeting then held it was voted, fifty-one to nineteen, to buy the Bellevue Street property. Pursuant to the vote, Mr. Davis and the trustees, on the one hand, and the owner, a bank, on the other, entered into negotiations which terminated in an agreement to purchase at the price of $3000, of which $1000 was paid at once. Shortly thereafter, Mr. Davis was notified by the bank

that it would be necessary to have the conveyance run to a corporation and that attorneys for the bank had examined the records and had been unable to find a church corporation under the name of Bethel African Methodist Episcopal Church. At that time Mr. Davis was not aware of the existence of the corporation organized in 1917.

On September 3, 1940, although no public notice had been given to the members, proceedings were had as a result of which a certificate of organization was executed by the clerk of the church and two members of the board of trustees setting forth that the members had voted by a two-thirds vote to organize the church, in conformity with state statutes, under the corporate name of "Bethel African Methodist Episcopal Church." This certificate was filed with the secretary of state on September 7, 1940, as was another certificate signed by the clerk of the church reciting that "at a meeting of the Ecclesiastical Society connected with The Bethel African Methodist Episcopal Church . . . it was voted by a two-thirds vote of the members present to assign, transfer and convey all the property and estate real and personal, and trust funds of said society" to the Bethel African Methodist Episcopal Church corporation "under and upon the same uses and trusts upon which the same had previously been held by said society," and that the property had been so assigned. On September 10, 1940, the bank conveyed to the new corporation the land and buildings at 210 Bellevue Street, and the balance of the purchase price was then paid. The conveyance was by quitclaim deed which contained no trust provisions. At the time of the purchase, the trustees and members of the church understood that the property was being bought upon the same independent basis that characterized the purchase of the other two parcels. The funds used to obtain the

Bellevue Street property belonged to the 1917 corpora-
tion.

At a meeting held on September 17, 1940, notice of
which Mr. Davis had given from the pulpit on two
prior Sundays, resolutions were adopted that the "So-
ciety" transfer and convey all of its property and estate
to the newly created corporation, that the pastor be
authorized to execute all documents necessary to effect
the transfer, and that by-laws be approved. Neither
by the notice stated from the pulpit nor during the
meeting itself was sufficient explanation given to enable
the members to comprehend the aim and intended
effect of the resolutions. The by-laws, which were
not read, provided for a form of government as a unit
of the General Church. Among many others ad-
dressed to that end was a provision which recited that
"All property and affairs of [the] church shall be held
and managed in accordance with the Rules and Disci-
pline of the African Methodist Episcopal Church." By
procuring the formation of the new corporation and
the approval of the by-laws, Mr. Davis intended to sub-
ject all properties of the local church to trusts and uses
contemplated by the rules and Discipline of the Gen-
eral Church. At no time, however, did the members
of the church intend to place their property under the
control of the General Church. Extensive renovations
and repairs were subsequently made to the Bellevue
Street property, and upon their completion services
were held in the building and have been conducted
there ever since.

The significance of the resolutions of the meeting of
1940 came to the attention of two members of the con-
gregation in 1943 and to that of certain others in 1945.
Although the first of several lawsuits challenging the
right of the new corporation to control of the proper-
ties was instituted by a group of dissidents in 1945, it

was not until the following year that most of the members of the church came to understand the import of the resolutions adopted in 1940. Dissensions which by now were rife culminated in the events occurring at the annual meeting of June 10, 1946. A large number attended and Mr. Davis presided. After disposing of various matters, the election of trustees became the order of business. When a motion was made and carried that the election be postponed, the presiding officer declared the meeting adjourned and vacated the chair. The members, however, proceeded to select another chairman and thereafter, by a two-thirds vote, passed several resolutions, the general tenor of which was to sever relations with the General Church, to dissolve the corporation formed in 1940, to rescind the by-laws adopted in 1940, to reopen the church as the independent church it was prior to 1940, and to return to the original corporation all properties in the control and possession of the new corporation. Certificates in conformity with these resolutions, attested by six of the nine trustees, were later filed with the secretary of state. At the same time, these trustees executed an "assignment and transfer" of all of the property of the new corporation to the old, as well as a deed of the Bellevue Street property from the former to the latter. Subsequently, the members voted to change the name of the church to The Independent Methodist Episcopal Church of Hartford.

Mr. Davis continues to occupy the Clark Street property as a parsonage. He uses the building on Bellevue Street, in part, as his office, and conducts services therein in the name of the 1940 corporation. In consequence of these deprivations, the plaintiff Independent M.E. Church has suffered financially to the extent of $500 through reduced collections and contributions. In addition to the three parcels of land involved, there

are church funds totaling about $12,900 in three banks.

This lengthy recital could be supplemented by many other facts, reference to some of which will hereinafter be made, but the foregoing is ample to reveal the nature and extent of the differences which have arisen between the parties.

After overruling a remonstrance to the referee's report, the court entered judgment dismissing the complaint in the second action, in which Mr. Davis and his associates sought injunctive relief. In the first case, it entered a declaratory judgment determining that the ownership of the realty and personalty is in the plaintiff church; damages to the amount of $500 were awarded, and the defendants were enjoined from using or otherwise asserting ownership of the property. The questions which the assignment of errors raises deal with the action of the court in overruling the remonstrance and rendering judgment on the report.

The remonstrance consisted of five subdivisions. The first raised the claim that the facts incorporated in thirty-five paragraphs of the report were found without evidence; the second, that seven paragraphs should be stricken, as they purport to recite mere statements of evidence; the third, that the report should be corrected by adding sixty-three paragraphs containing facts which were either admitted or undisputed; the fourth, that twenty of the referee's twenty-two conclusions as to ultimate facts are legally and logically inconsistent with the subordinate facts found; and the fifth, that eighteen conclusions, asserted to be the only ones which the referee could properly have drawn, should be added to the report.

The nature of this deplorable controversy, involving, as it does, grave dissension among the members of a religious congregation, has impelled us to examine with especial diligence all of the evidence submitted to the

referee. The facts found are abundantly supported by the testimony of witnesses and by documentary proof, and the elimination of those paragraphs which, it is urged, are mere statements of evidence would have no effect on the result. *Kurtz* v. *Farrington*, 104 Conn. 257, 260, 132 A. 540; *Watrous* v. *Sinoway*, 135 Conn. 424, 428, 65 A. 2d 473. This may likewise be said of most of the additional facts which the defendants sought to have added to the report, while other requested additions involved facts which were very much in dispute. The fourth and fifth subdivisions of the remonstrance present the vital although relatively simple question presented by these appeals. This question is whether or not the subordinate facts legally and logically support the ultimate fact, expressed in various ways in the report, that, while the plaintiff church followed the spiritual guidance and leadership of the General Church, it reserved the right to control its own property and in this respect did not surrender its autonomy to the General Church. *Liefeld* v. *Coffin*, 103 Conn. 279, 283, 130 A. 576; Practice Book § 172. The importance, then, of the referee's conclusion that the plaintiff church is independent and autonomous is crucial. If this conclusion is to stand, these appeals are without merit.

The polity of the A.M.E. Church is not congregational but episcopal. Its hierarchy is developed in pyramidal pattern from the General Conference at the apex down through the bishops and various conferences to the local churches at the base. Authority flows from one level to another, and the higher subjects the lower to its rule.

Where religious discord, due to schism or otherwise, exists in a local church practicing any form of faith, the control of the church property is in that part of the congregation which is acting in harmony with its own

law and the ecclesiastical laws, usages, customs and principles which were accepted by it before the dispute arose. *McAuliffe* v. *Russian Greek Catholic Church*, 130 Conn. 521, 527, 36 A. 2d 53; *Russian Orthodox Greek Catholic All Saints Church* v. *Kedrovsky*, 113 Conn. 696, 704, 156 A. 688. From this it follows that, when a local church has associated itself with a general church to whose rule of matters temporal and spiritual it has submitted in conformity with prescribed requirements for such affiliation, the members who sever relations with the general church, repudiate the higher authorities and establish an independent church are not entitled to take the church property with them. *McAuliffe* case, supra, 536; *Kedrovsky* case, supra, 704; *Watson* v. *Jones*, 13 Wall. (80 U. S.) 679, 734, 20 L. Ed. 666. If the members of a church founded upon the polity of local autonomy either as to ecclesiastical affairs or secular affairs or both seek to join a denomination in which the polity is episcopal or presbyterian, they are not permitted to take the property of the local church with them, at least against the objection of a minority. Property once dedicated to the use of a church of one polity may not be diverted to the use of a church of a different polity. *Christian Church* v. *Church of Christ*, 219 Ill. 503, 512, 76 N. E. 703; *Kemp* v. *Lentz*, 46 Ohio L. Abs. 28, 31, 68 N. E. 2d 339.

To be sure, the plaintiff church has, since its establishment in 1917, followed the ritual and form of worship known as African Methodist Episcopal. Nevertheless, its founders and their successors stoutly and consistently maintained from the very beginning that the control of its property was reserved to its members, although they accepted the spiritual leadership of the General Church. Numerous witnesses who presented themselves before the referee testified to this effect and, undoubtedly, added weight was accorded their testi-

mony because of the manner in which their church property was acquired and managed by the local trustees.

To offset the effect of such evidence, the defendants, in their brief, construct a balance sheet, so-called, wherein they enumerate acts of apparent conformity and nonconformity to the Discipline in order to test, as they put it, the referee's conclusion that the local church was independent of the General Church. Among the former they list such things as these: (1) Practically all of the founders of the church had previously been members of southern churches adhering to the faith; (2) the name they originally selected for the church carries an inescapable inference of intent to join the General Church; (3) the services have been conducted in substantial conformity with the usages, practices and Discipline of the denomination; (4) all of the pastors have been appointed by the bishop; (5) the church has participated in the annual conferences, and on one occasion the General Conference convened in it; (6) the church has contributed to the support of the General Church and, in turn, has received financial assistance from it.

However appealing these considerations may be, it is not within our province to evaluate them. *Dudley* v. *Deming*, 34 Conn. 169, 174; *Styles* v. *Tyler*, 64 Conn. 432, 450, 30 A. 165. It rested with the referee to pass upon the credibility of witnesses and to determine the weight to which the evidence was entitled. *Lalley* v. *Bridgeport*, 96 Conn. 501, 503, 114 A. 678. He has found on substantial and corroborated evidence a course of conduct of the members of the church continuously directed towards self-government. The loosely knit group of worshipers of 1916 organized itself in corporate form one year later only upon assurance that the church was to be independent of the

control of others. This same policy was thereafter expressed time after time, not only by the lay leaders but also by various pastors who were assigned to the church prior to 1940. All three parcels of land were purchased with the understanding that their control would lie exclusively with the local church. The deeds did not follow the form prescribed by the Discipline. No ceremony of dedication of the property to the General Church was ever held. The trustees of the assets of the church were not elected as required of affiliated churches.

Nor did the formation of the corporation of 1940 and the efforts of the pastor to bring the church securely within the hierarchy nullify its autonomous status. That the title to the Bellevue Street property was taken in the name of the new corporation did not destroy the use and trust to which the members intended it to be subject. General Statutes § 7082. The real issue on this point, as in the *Kedrovsky* case, supra, 699, "is not so much that of legal title to the premises in question as it is that of the right of the plaintiff [church] to control them and their use." To give effect to the true use does not involve, as the defendants assert, a collateral attack upon the 1940 corporation.

As already stated, the finding of subordinate facts must stand. The only question before us is whether the referee's conclusion that the plaintiff church was independent in its temporal affairs was legally and logically drawn from them. *Gowdy* v. *Gowdy*, 120 Conn. 508, 509, 181 A. 462. The facts just stated, with others that might be mentioned, furnish a sufficient basis for the conclusion. The independence of the local church was a policy which inspired its founders and motivated the acquisition of its realty and personalty. That the church accepted the dogma of the denomination, followed its ritual, participated in its

conferences and contributed to its support is not controlling. *Malanchuk* v. *St. Mary's Greek Catholic Church*, 336 Pa. 385, 399, 9 A. 2d 350; see *Drozda* v. *Bassos*, 260 App. Div. 408, 23 N. Y. S. 2d 544; *Calkins* v. *Cheney*, 92 Ill. 463, 479. We cannot hold that the conclusion of the referee was unwarranted.

Two final claims merit mention. The defendants challenge the court's action in entering judgment in the first case on the theory that there was neither finding nor evidence that the plaintiff individuals are worshiping in the A.M.E. faith or adhering to the laws, customs, principles and usages accepted by the members of the church before the dispute began. In this the defendants are mistaken. The referee expressly found to the contrary. The defendants further claim that the court was in error in entering judgment without stating the uses and trusts upon which the property is to be held. This claim is without merit. The judgment declares that all right, title, interest and ownership in and to the realty and personalty is in the plaintiff church. This does not leave the property free from trust purposes. It remains subject to the uses of the members of the autonomous local church. General Statutes § 7082.

As the assignment of error with respect to the award of damages was not pursued orally or in the brief, the matter will not be considered. *State* v. *Jones*, 124 Conn. 664, 665, 2 A. 2d 374.

There is no error.

In this opinion the other judges concurred.