ALLEN C. CALKINS *et al.*

*v.*

CHARLES E. CHENEY *et al.*

1. RELIGIOUS SOCIETIES — *of their property, and the ownership and control thereof, under the statute concerning the incorporation of such societies.* In the year 1855, the parish or congregation of Christ Church of Chicago, being professedly of the Protestant Episcopal Church, became incorporated under the

general laws then in force providing for the incorporation of religious societies, and trustees for the corporation were duly appointed. A lot of ground upon which is the house of worship and the parsonage, was contracted for prior to the incorporation, but was not conveyed until in the year 1862.    The deed conveying the property was simply to the "Trustees of Christ Church," and contained no express declaration of trust, nor was there any separate written declaration of trust by the trustees.   Such portion of the purchase money for the lot as has been paid, as well as the money for the erection of the house of worship and the parsonage, was derived from donations by members of the parish or congregation and, to a small extent by others, and from the rental or sale of pews in the house of worship.   Upon bill exhibited in the year 1872 by certain persons "for themselves and such other members of the parish of Christ Church as adhered to the laws, doctrines, etc., of the Protestant Episcopal Church," it was sought to enjoin the then acting rector of Christ Church from further acting in that capacity, and from occupying the parsonage and using the house of worship as such, upon the alleged ground that the said rector had been, by the proper church judicatory, deposed from the ministry of the Protestant Episcopal Church, because of non-conformity with certain of its tenets.   It was *held*, the property belonged to the society or congregation of Christ Church, in its corporate capacity, not in trust for the benefit of the Protestant Episcopal Church as a religious denomination, but independently of it, and not subject to the control of any ecclesiastical judicatory.

2.   The religious societies incorporated under this law—the division in the chapter in the Revised Statutes of 1845, relating to corporations, entitled " Religious Societies "—are not to be classified with ecclesiastical corporations, as known to the English law, and as holding their property, in the absence of any declared or fairly implied trust, subject to ecclesiastical control or by ecclesiastical sanction, but rather they should be classed with civil corporations to be controlled and managed under the general principles of law applicable to such corporations, as administered by the civil courts.

3.   So, notwithstanding the rector of Christ Church may have been deposed from the ministry of the Protestant Episcopal Church under competent ecclesiastical authority, and the members of the parish or congregation still choose to attend upon his ministrations in their house of worship, this can not operate to divest the parish or congregation of the title to their property, or of the right to occupy and use it in such manner and for such purpose as they may deem proper.

4.   SAME—*effect of the amendatory act of* 1855.   There is nothing in the act of February 15, 1855, amendatory of the act of 1845 concerning the incorporation of religious societies, which in any way affects the right of such societies to use and occupy their own property, as secured to them by the law under which they were incorporated.

5.   SAME—*right of deposed minister to receive compensation.*   If persons choose to give money to a person acting as a religious teacher or minister, it is his

right to receive it, without regard to whether he rightfully or wrongfully officiates in such capacity, and he can not be enjoined from receiving such voluntary contributions merely because he has been deposed from the ministry by some ecclesiastical judicatory.

APPEAL from the Circuit Court of Cook county; the Hon. E. S. WILLIAMS, Judge, presiding.

This was a bill in chancery, by Allen C. Calkins, James O. Cleveland and Henry F. Jennison, pew-owners in the house of worship of Christ Church Parish, Chicago, filed in May, 1872, in behalf of themselves and such other members of said parish "as adhere to the laws, doctrines, worship, discipline and government of the Protestant Episcopal Church in the United States of America, and in the diocese of Illinois, and in behalf of such other persons as contributed money or other means toward the acquirement of the property of said parish," against Charles E. Cheney, and against the wardens and vestrymen and treasurer of said parish, the other defendants named in the bill, and which bill alleges the organization, in 1855, of said parish, as a parish of the said Protestant Episcopal Church, under the pledges required, and in compliance with the laws of said diocese, by which it acceded to the "constitution, canons, doctrines, discipline and worship" of said Church in the United States and in said diocese, and that it was admitted, on its own application, into union with the convention of said diocese in September, 1856; alleges also the continuance of the parish in such relation up to the filing of the bill; also the acquirement of the church edifice and property (including the parsonage) of said parish, by means of contributions and loans made for the express purpose of acquiring said property and building such edifice for the use of said parish, as a parish of said Protestant Episcopal Church, said complainant Calkins being one of the contributors; also that said Cheney was a minister of said Church, and was rector of said parish for a series of years, until June 2, 1871, when, after due presentment and trial, he was degraded from the

ministry of said Church by the Bishop of the diocese of Illinois, by reason whereof, under the laws, regulations and discipline of said Church, he could no longer lawfully officiate in any of the functions of such ministry; that nevertheless, in contempt of such degradation, and in violation of the laws and discipline of said Church, said Cheney has continued, ever since such degradation, and still continues to officiate as a pretended minister of said Church in said parish and in said church edifice, with the knowledge and procurement of said wardens and vestrymen, and has all the time been and still continues to be paid from $3000 to $4000 per annum by the treasurer of said parish, by order of such wardens and vestrymen (over and above the use of the parsonage of said parish,) out of moneys arising, in the main, from rents of and taxes and assessments upon the pews of said church edifice.

The prayer of the bill seeks for an injunction restraining said Cheney from officiating as a pretended minister and said wardens and vestrymen from permitting him to so officiate in such church edifice, and from using the property, revenues and income of said parish for his support, and restraining said Cheney from receiving, and said wardens and vestrymen and said treasurer from paying to said Cheney any of the revenues and income of said parish, for any services rendered since June 2, 1871, or to be rendered by him as such pretended minister, and restraining said Cheney from using, and the said wardens and vestrymen from allowing him to occupy the parsonage building of said parish, without paying a reasonable rent therefor, etc.

Answers were filed, and the cause heard upon the pleadings and proof. The court below dismissed the bill. The complainants thereupon appealed.

Mr. S. CORNING JUDD, for the appellants:

1. When a minister is deposed the relation of minister and congregation is dissolved. *Dieffendorf* v. *Reformed Calvinist Church*, 20 Johns. 12; *Den. etc.* v. *Bolton et al.* 7 Halsted,

220. And he is thereby deprived of his right to recover his salary. *Dutch Church of Albany* v. *Bradford*, 8 Cowen, 457 ; *Martyn* v. *Hind*, Cowper's R. 437 ; *Chase et al.* v. *Cheney*, 58 Ill. 586.

2. The employment or continuance of the deposed minister by the vestry was such a breach of trust as will be enjoined in a court of equity. *Robertson* v. *Bullions*, 9 Barb. 64 ; *Milligan* v. *Mitchell*, 1 Mylne & Kean, 446 ; the same case in 3 Mylne & Craig's Chan. R. 72.

3. The decisions and sentences of the church authorities as to the deposition of ministers and other ecclesiastical matters are final and conclusive, and are binding on secular courts. *Robertson* v. *Bullions*, 9 Barb. 134 ; *State of Missouri ex rel. Watson* v. *Farris et al.* 45 Mo. 196, etc.; *Dieffendorf* v. *Reformed Calvinist Church*, 20 Johns. 12, 14 ; *Dutch Church of Albany* v. *Bradford*, 8 Cowen, 553, 559 ; *Shannon* v. *Frost*, 3 B. Monroe, 258 ; *Harmon* v. *Dreher*, 1 Speer's Eq. (S. C.) 120, 121 ; *Den. etc.* v. *Bolton*, 7 Halsted (N. J.) 206, 220, 221, 223 ; *German Reformed Church* v. *Seibert*, 3 Barr (Pa.) 291 ; *Walker* v. *Wainright*, 16 Barb. 486 ; *Garten* v. *Pinick* (Ky.) 1869 ; *Gibson* v. *Armstrong*, 7 B. Monroe, 481. See, also, the very important recent cases of *Chase et al.* v. *Cheney*, 58 Ill. 509, and *Watson* v. *Jones*, 13 Wall. 679.

4. The minority, however small their number, adhering to the church authorities, etc., are the true representatives of the church congregation, etc., for all civil purposes. *Baker* v. *Fales*, 16 Mass. 488, 505-7, etc.; *Stebbins* v. *Jennings*, 10 Pick. 182 ; *Page* v. *Croly*, 22 id. 211 ; *Harmon* v. *Dreher*, 1 Speer's Eq. 87, 123, 124, 126 ; *Kniskern et al.* v. *Lutheran Churches*, 1 Saudf. C. R. 439 ; *Presbyterian Congregation* v. *Johnson*, 1 Watts & Serg. 37 ; *Den. etc.* v. *Bolton et al.* 7 Halsted (N. J.) 206 ; *App.* v. *Lutheran Congregation*, 6 Barr (Pa.) 201, 210 ; *Den. etc.* v. *Pilling et al.* 4 Zabriskie, 653-7-8, 661 ; *Milligan* v. *Mitchell*, 3 Mylne & Craig, 81-2-3 ; *Newton* v. *Proctor*, 10 Bush, 318 ; *Attorney General* v. *Pearson*, 3 Merivale, 353 ; *Field* v. *Field*, 9 Wend. 401 ; *Robertson* v. *Bullions*, 1 Kernan,

243; *Baptist Church* v. *Witherell,* 3 Paige, 296; *Lawyer* v. *Chipperly,* 6 id. 281; *Miller* v. *Goble,* 2 Denio, 492; *Attorney General* v. *Shore,* 7 Simons, 290; 9 Clark & Finnelly, 355; *Orphan Asylum* v. *McCartee,* 9 Cowen, 440. "When a congregation becomes dissentient among themselves, the nature of the original institution must alone be looked to as a guide for the decision of the court," etc. *Attorney General* v. *Pearson,* 3 Merivale, 409; *Cragdallie* v. *Aikman,* 1 Dow's P. C. 1; *Foley* v. *Wontner,* 2 Jacob & Walk. 245; *Leslie* v. *Birnie,* 2 Russell, 114; *Davis* v. *Jenkins,* 3 Ves. & Beemes, 156; *Milligan* v. *Mitchell* (Scotch case,) 1 Mylne & Kean, 446; 3 Mylne & Craig, 72, 81-2-3; *Field* v. *Field,* 9 Wend. 400, 401.

A majority of a church congregation can not depart from the system of the church. If they do so, such departure constitutes a breach of trust. *Milligan* v. *Mitchell,* 3 Mylne & Craig, 81-2-3.

5. Equity will give effect to trusts for religious uses, and restrain abuses. *Den. etc.* v. *Pilling et al.* 4 Zabriskie, 661; *Miller* v. *Goble,* 2 Denio, 492; 10 Paige, 627.

The trustees of church property will be enjoined in chancery from diverting the property and temporalities. And they will be compelled to account for the rents and income perverted. *Kniskern et al.* v. *Lutheran Churches,* 1 Sanf. C. R. 440, 564, etc.

The donations of money and property having been given for the purposes of a Protestant Episcopal Church, the rules, discipline and doctrines of that Church, at the time of the donations, will control as to the direction to be given to the use of the property and revenues thereof. *Attorney General* v. *Shore,* reported in *Attorney General* v. *Pearsons,* (in note,) 7 Simons, 312; *Shore et al.* v. *Attorney General,* 9 Clark & Finnelly, 355. See, also, *Field* v. *Field,* 9 Wend. 400, and case of *St. Mary's Church,* 7 Serg. & Rawle, 539.

6. Where a trust is created, the intent of the donors may be implied from the name of the society or church designated,

its tenets, etc.   *Kniskern et al.* v. *Lutheran Churches,* 1 Sandford, 439.

The same doctrine is held in *Miller* v. *Goble*, 2 Denio, 540, 570.   See Gardiner's opinion—he says, "In these cases, the corporate or denominational name, etc.,   *   *   *   may be a sufficient guide as to the nature of the trust," etc.

The connection of the congregation "with the ecclesiastical authorities, having the rule over them, is inferred from the circumstances of each case."   *Den. etc.* v. *Pilling et al.* 4 Zabriskie, 657, and authorities cited.

7.   In the following cases the trustees, etc., were enjoined from diverting temporalities of churches, etc.:   *Robertson* v. *Bullions*, 9 Barb. 134-5-6, etc.; *Kniskern* v. *Lutheran Churches*, 1 Sandford, 429, 564; *Attorney General* v. *Pearsons*, 3 Merivale, 353, 419; *Milligan* v. *Mitchell* (Lord Brougham, Chancellor,) 1 Mylne & Kean, 446; *Same* v. *Same* (on appeal, final hearing,) 3 Mylne & Craig, 83, 84 (opinion by Lord High Chancellor Cottenham).   *Bullions et al.* v. *Robertson*, 1 Kernan, 273.

8.   In this case there was a sufficient declaration of trust in the use of a denominational name.   In the certificate of organization of the parish of Christ Church, it is described as "a parish of the Protestant Episcopal Church in the Diocese and State of Illinois."   *Hale* v. *Everett*, 53 N. H. 49.

In *Attorney General* v. *Moore's Executors*, 19 N. J. Eq. (4 C. E. Green,) decided June, 1868, a distinction is made between a religious charity, and educational or eleemosynary charity, and though in the latter case they held the name of the society to be immaterial, by a divided court of seven against six, yet they all admit and claim that in the case of a religious trust, the doctrines of *Miller* v. *Goble*, 2 Denio, 492, and *The People* v. *Steele*, 2 Barb. 329, were correct, and should be carried out, and that in a grant to a religious corporation, its distinctive denominational name, as descriptive of its ecclesiastical connection, was indicative of the particular religious tenets designed to be propagated.

"The very term 'church' imports an organization for religious purposes, and property given to it *eo nomine,* in the absence of all declaration of trust, must, by necessary implication, be intended to be given to promote the purposes for which a church is constituted." *Baker* v. *Fales,* 16 Mass. 494.

Mr. MELVILLE W. FULLER, for the appellees:

The decree of the circuit court should be affirmed, because the property is held for the use of this particular congregation.

The case does not involve any specific grant, donation or bequest. The conveyance of the property was made to the "Trustees of Christ Church," and no declaration of trust whatever was made in the deed. It is to be presumed, upon the face of the conveyance, that the intention of the parties to it was that the property should be held independently of any external ecclesiastical body. The church records show that these trustees were not the wardens and vestrymen at all, and the evidence of surrounding circumstances demonstrates that the intention was that this property should be controlled by the congregation alone. Conditions and limitations in respect to the use of the property are not to be raised by inference or argument.

Appellants' contention is an attempt to change the actual transaction into something different from what it actually was, which can not be done. *O'Hear et al.* v. *De Gœsbriand,* 33 Vermont, 593; Perry on Trusts, §§ 732, 734; 2 Story's Eq. Jur. § 1191 a, note 2.

It matters not what the laws of the Church contemplated or required, it is enough that this congregation undertook to protect itself, and did it.

In order to dedicate property to the use of the Protestant Episcopal Church generally, the intention must be expressed in some declaration of trust in the deed, devise, or otherwise. The mere fact that the congregation assumes to belong to that Church is not enough.

Assume the title to the property to be in the corporation, who constitutes the corporation? Is it the trustees or the whole body of the congregation? It is submitted that it is the latter, and hence that when disputed questions touching property or other rights arise, they are to be determined strictly on the principles applicable to corporations. *Nicolls* v. *Rugg,* 47 Ill. 52; Rev. Stat. 1845, §§ 44, 46, 47, ch. 25, Div. III.; Gross' Stat. 1868, p. 128, §§ 1, 2, 3, 4.

The society elects trustees; the society fills vacancies; the society removes trustees; the society directs conveyances and mortgages; the members of the society regulate the management of its estate. It is the society that is the corporate body, its members are the corporators, and the trustees are the managing officers. The statute is the only charter to the civil corporation created under it. To decide that such a corporation holds its property subject to any ecclesiastical judicatory or governing body is to overrule the language of the statute. By organization under the statute, a corporate body, called a religious society, is interposed between the church and the civil law, and this enables courts to escape the adjudication of matters of ecclesiastical concern. The intent of the statute is to keep Church and State as far apart as possible, and to effectuate this by the removal of the temporalities from spiritual control.

The effect of the statute can be avoided by remaining in voluntary association or by declarations of trust devoting property to the use of and under subjection to the governing or higher authorities of a particular church or denomination. *Robertson* v. *Bullions,* 11 N. Y. 243; *Gram* v. *Prussia Society,* 36 id. 161; *Petty* v. *Tooker,* 21 id. 267; *Burrel* v. *Ass. Ref. Ch.* 44 Barb. 282; *Watkins* v. *Wilcox,* 4 Hun. 225; *Keyzer* v. *Stanifer,* 6 Hammond, 365; *Miller* v. *English,* 1 Zabriskie, 321; *Vestry, etc.* v. *Barksdale,* 1 Strobhart's Eq. p. 197.

An examination of cases in Illinois will show that the point here raised has never been expressly passed upon by this court. *Happy* v. *Morton,* 33 Ill. 398; *Brunnemeyer* v. *Buhre,*

32 id. 183; *Ferraria* v. *Vasconcellos*, 23 id. 456; *Lawson* v. *Kolbenson*, 61 id. 416 ; *Ada Street Meth. Ch.* v. *Garnsey*, 66 id. 132.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The parish or congregation of Christ Church, in Chicago, was incorporated in 1855, under the general laws of this State providing for the incorporation of religious societies, and trustees for the corporation were duly appointed. The lot of ground whereon is the house of worship and the parsonage, although contracted for prior to the incorporation, was not conveyed until in November, 1862. The deed conveying the property is simply to the "Trustees of Christ Church," and contains no express declaration of trust, nor is there any separate written declaration of trust by the trustees. A portion only of the purchase money for the lot has been paid, and this, as well as the money for erecting the house of worship and the parsonage, was derived from donations by members of the parish or congregation, and, to a small extent, by others, and from the rental or sale of pews in the house of worship.

The evidence shows that a large majority, amounting, indeed, almost to unanimity, of those composing the parish or congregation of Christ Church were, when the donations were made, and always have been, of the school in the Protestant Episcopal Church known as "Low Church;" that the Bishop was of the school known as "High Church," and that there was some feeling of jealousy and antagonism between these schools, which feeling so far affected the majority of the parish or congregation as to induce a desire that the church property should be held and used for the benefit and under the control of the parish or congregation, free from the control of the Bishop. And the only circumstances proved tending to raise an implication of the purpose for which the property should be held and used show that it was for the benefit of the parish

or congregation, free from the interference and control of the Bishop. The incorporation of the parish or congregation, and the appointment of trustees, and the conveyance to them, so far as any particular purpose or object is shown to have been thereby intended, were to attain this end.

Thus—Henry S. Munroe says: "I was a vestryman; my family always attended. I have been a practicing attorney since 1854. About the time the present property of Christ Church was purchased the vestry, or a part of it, came to me and said that they wished the deed prepared so that the congregation could, under any circumstances, control the property, and that it should not be subject, in any manner, to the Bishop. I advised them to have a trustee or trustees regularly appointed by those interested, and to have the property deeded to them to hold for those interested."

Otto Moore says: "I was one of the original founders of the church.  *  *  *  At its inception the parish consisted of not exceeding eight or ten persons, and a congregation of not over forty or fifty. About 1858 or 1859, we bought the lot on which the church now stands. We had several meetings at my house of the vestry and neighbors—also at other houses—for the purpose of getting means to build the church. About the time we commenced building the Bishop had just got through a difficulty with Beers about property that he had deeded to himself and held in his own name. To guard the church that we were about to build, we wanted to fix it so that the congregation could hold it and control it as 'Low Church' property. Mr. Henry Munroe was consulted. He suggested that the property should be put into the hands of trustees. Trustees were appointed for that purpose—Mr. Mills, Mr. Parsons, and, I think, Mr. Crouch.  *  *  *  I supposed that the conveyance would be fixed so that the property could be held by the congregation. It was talked about at every vestry meeting for three months. I understood it was conveyed to the trustees for the benefit of the congregation."

Again, on cross-examination, he says: "This matter of the title was carried unanimously in the vestry meeting, I think."

Horatio N. Hurlbut says: "I am a pew-holder in Christ Church. * * * I bought the pew after stating that if the Bishop had any control over that pew, in any shape, I would not buy it, and was assured that he had no control over it. I had nothing special to do with the purchase of the present Christ Church property or the manner of its conveyance. I remember only the understanding that was had by the vestry, that it should be purchased and deeded so the congregation could hold it. * * * I suggested to the vestry that the property be deeded in such a way that the Bishop could have no control of it whatever, but that it should belong to and be controlled by the congregation. I purchased my pew with the understanding that this had been done."

And George A. Sackett says: "I was connected with Christ Church for about twelve years,—from 1859 to 1870,—warden and vestryman most of the time. In 1863 the property was purchased to build a church. I advised the purchase, and paid money toward it. We had frequent meetings of the vestry or of the congregation, at which the purchase was discussed. I attended such meetings. * * * There was a good deal said as to Bishop Whitehouse getting the churches in his diocese into his possession, and the intention was that he should not get this. Three trustees were appointed to have possession of the property. * * * These trustees were chosen by vote of the congregation. I believe the property was conveyed to the trustees."

On cross-examination he further says: "The intention was that the property should belong to the congregation,—pew owners, pew renters,—and they were to have the sole control and management."

The bill seeks to enjoin the wardens and vestrymen of the church from continuing the Rev. Charles Edward Cheney as rector, and from allowing him to occupy the parsonage and to use the house of worship, and from paying him for services as

rector from the funds of the church; and, also, to enjoin him from further acting as rector, and occupying the parsonage and using the house of worship as such, and from receiving compensation for services as rector from the funds of the church.

So far as the funds of the church are derived from donations made for the express purpose of paying Cheney as rector, there can be no pretense for the injunction. If persons choose to give him money, he certainly is entitled to receive it, without regard to whether he wrongfully or rightfully officiates as rector.

The controversy is, whether allowing him to occupy the parsonage and officiate in the house of worship as rector, is a breach of trust which entitles appellants to relief by injunction. We shall, in considering the question, assume, although the fact is denied by Cheney, that he was, by the proper church judicatory, deposed from the ministry of the Protestant Episcopal Church, because of non-conformity with certain of its tenets.

Cheney is continued as rector by those filling the official positions of the parish or congregation, pursuant to the wishes of almost the entire parish or congregation,—many of them, perhaps a majority, expressing a determination to not attend worship at that church if he should be removed and a rector preaching different doctrines employed in his stead.

If, under the facts before stated, the parish or congregation has the right to declare what religious use the property shall be applied to, without regard to the decision of ecclesiastical judicatories, it is clear the injunction should not be awarded; and this is the only inquiry to which we shall direct our attention.

Under the division of the chapter relating to corporations, entitled "religious societies," as found in the Rev. Stat. of 1845, section forty-four authorizes the members of a society or congregation formed for purposes of religious worship to receive, by gift, devise or purchase, a quantity of land not

exceeding ten acres, and to erect or build thereon such houses and buildings as they may deem necessary for the purposes aforesaid, and to make such other use of the land, and such other improvements thereon, as may be deemed necessary for the comfort and convenience of such society or congregation, and to appoint trustees to take and hold title to the land and improvements.

Section forty-six provides, that the title to the property shall be held by the trustees for the purposes therein named, and no other; and the trustees are authorized, under the direction of the society or congregation, to execute deeds and conveyances of and concerning the estate and property therein authorized to be held by such society or congregation, subject to the proviso that "no deed or conveyance shall be made of any estate held as aforesaid, so as to defeat or destroy the interest or effect of any grant, donation or bequest which may be made to any such society or congregation; but all grants, donations and bequests shall be appropriated and used as directed by the person or persons making the same."

Section forty-seven confers upon the society or congregation power "to provide for the filling of vacancies which may happen in the office of trustee, and also to remove trustees from office, and to adopt such rules and regulations in relation to the duties of trustees and the management of its estate as the members may deem proper, not inconsistent with the constitution and laws of this State or of the United States."

Section forty-eight provides, that "upon the dissolution of any society or congregation formed under the provisions of this division, the estate and property of such society or congregation shall revert back to the persons, their heirs and assigns, who may have given or contributed to the purchase of, or payment for the same, according to their respective rights."

From these references to the statute, it is clear that the trustees of an incorporated religious society or association do not hold the property, in the absence of a declared, or at least clearly

implied trust, for any church in general, nor for the benefit of any peculiar doctrines or tenets of faith and practice in religious matters, but solely for the society or congregation whose officers they are; and that they are not, in the discharge of their duties, subject to the control of any ecclesiastical judicatory. The property belongs to the society or congregation, so long as the corporation exists, and when it ceases to exist the property belongs to the donors or their heirs—and this conclusively distinguishes this property from property held in trust for the benefit of a particular religious denomination. Where property is held in trust for the benefit of a particular religious denomination, the dissolution of the legal corporation can in nowise affect the trust, so long as the religious denomination has an existence—for it is to it, and not to the corporators, that the use belongs.

The society or congregation may, under the statute, not only erect a house of worship on the land, but it may also "make such other uses of the land, and make such other improvements thereon, as may be deemed necessary for the comfort and convenience of the society or congregation." If the society or congregation so directs, the trustees must convey away the land and property. The society or congregation appoints the trustees and may remove them and fill the vacancies. It may adopt such rules and regulations in relation to the duties of the trustees, and the management of its estate, as the members may deem proper. In all these things the society or congregation exercises its discretion, and acts only in obedience to its own sense of what is needful and proper; and the only restriction imposed is, not that its rules and regulations, etc., shall be in conformity with the canons, etc., of the church with which the society or congregation professes connection, or subject to the supervision and control of any body of persons representing such church, but simply that they shall not be inconsistent with the constitution and laws of this State or of the United States.

Most obviously, property held in trust for the benefit of a

particular religious denomination, or rather for the inculcation of certain defined religious tenets, can not be held subject to be conveyed away or improved and used in accordance with the dictates of a society or congregation. Where property is held in trust for the use of principles, then conformity with those principles is indispensable, and any deviation is a breach of trust—but where it is held in trust for the use of a society or congregation, there can be no breach of trust so long as the wishes of the society or congregation are regarded. The distinction is that between the promotion of a principle in the abstract, and the convenience and welfare of a society or congregation as an aggregation of persons.

The incorporated societies here contemplated are, therefore, not to be classified with ecclesiastical corporations, as known to the English law, which were composed entirely of ecclesiastical persons and subject to ecclesiastical judicatories, but rather with civil corporations to be controlled and managed under the general principles of law applicable to such corporations, as administered by the civil courts.

It is contended on behalf of appellants, that the amendment to the act, before referred to, approved February 15, 1855, (Laws of 1855, p. 171) materially changes the character of the corporation, and militates against the position we have assumed. In that view we do not concur. The first section merely provides that the officers of any religious society, of whatever name or title, but whose duties correspond with those of trustees, may make and file the certificate required by the original act to be made and filed by the trustees, to effect incorporation,—and the second section is this:

"The persons elected under said law in the capacity of trustees, whether known by the name of trustees, wardens, vestrymen or any other name, may assume and continue to use the name, style or description, as a corporation, by which they are known in the discipline or organization of the society to which they belong, or by which they are elected, and shall

by such name be known and described in all matters pertaining to their said corporation."

Surely there can be no rational pretence that this section changes or in the slightest degree affects the nature of the trust upon which the corporate property is held. It simply provides that those who act as trustees may be known by the names prescribed by the church for persons performing like duties, instead of being called "trustees," and that such name and style may be assumed and used as the corporate name, and that is all. The effect of a society or congregation becoming incorporated, as respects its property rights, is not, even by the remotest inference, alluded to.

The only other section is limited to declaring the amendment a public act.

We concede that the evidence here shows that Christ Church was organized as a parish of the Protestant Episcopal Church, and we doubt not it is liable to the discipline of that Church. But that does not affect property rights acquired and held for the use of the parish or congregation as a corporate body, as distinct from the Protestant Episcopal Church in general.

We also concede that if it were shown that this property is held in trust for a certain sect or denomination, *i. e.* for the inculcation and maintenance of a certain defined religious belief, and that the teachings of the Rev. Mr. Cheney are not in accordance with that belief, there would be ground for the injunction, under the statute and the previous decisions of this court. But nothing of the kind here appears. This parish or congregation, in acquiring title to this property, were desirous of having it placed where they, as an aggregate body, could control it, and where it would be free from the control of the Bishop; and, as one of the means to accomplish this end, they incorporated under the statute. No express trust was declared, and none can be implied other than in favor of the society or congregation, as contradistinguished from the church at large, under the facts here developed. We have examined all the cases referred to in the very able and elaborate briefs of coun-

sel, and we deem it sufficient to say none of them sanction the idea contended for by appellants.

That a trust can be created in opposition to the known will and the earnest efforts to the contrary of those by whom it is claimed to be created, is a doctrine which we can not endorse, and one which we have never yet found any authority to sanction.

It may be that this society or congregation, by the very act of putting this property where they could control it, committed an offence against the canons of the Church. If so, the Church, for that act, may impose ecclesiastical punishment. But this can furnish no ground for us to say the parish or congregation intended, with regard to its property, what the evidence plainly shows it did not intend, and that the presumption, from the act of incorporation under the statute, shall be one for which the statute furnishes no warrant.

This property, and its use, belong to the parish or congregation, and there is no sufficient reason for taking it from them and giving it to the church at large for the benefit of others.

We discover no error in the record, and the decree is affirmed.                                             *Decree affirmed.**

---

* This cause was heard at a former term of the court, but on account of the papers being accidentally mislaid in the clerk's office, they did not reach the Reporter until time for insertion in the present volume.