MARY DROZDA and Others, and All Others Similarly Situated, Appellants, *v.* NICHOLAS M. BASSOS and Others, Respondents.

Third Department, October 31, 1940.

*McManus & Buckley* [*Herbert H. Ray, Thomas F. Garrahan* and *Peter J. McManus* of counsel], for the appellants.

*Bernard H. Chernin* [*James B. Gitlitz* and *A. E. Gold* of counsel], for the respondents.

HILL, P. J. Appeal from a judgment dismissing plaintiffs' complaint on the merits.

St. Michael's Greek Catholic Congregation was incorporated under the Membership Corporations Law of the State of New York on January 3, 1905. So far as relevant to the issue here presented, the certificate states the purpose of the corporation, " To preserve and keep the property now belonging to and hereafter to be acquired by the said corporation for the benefit of the people belonging to and practicing the teachings of the Greek Catholic Church or Congregation residing in the City of Binghamton, N. Y., and surrounding towns. Said property, however, is never to be conveyed or acquired, either directly or indirectly to the benefit of the Russian Orthodox Schismatic Church or any of its branches or to the benefit of any other church or congregation whatever, except that the same, or any part thereof, may be hereafter deeded or turned over to any Greek Catholic Church which may hereafter be incorporated under the laws of the State of New York or otherwise, and have its place of worship within the City of Binghamton, N. Y." The plaintiffs assert that the church is a Catholic church united with Rome and under the control of the Pope; the defendants that it is independent and under the control of no outside governing authority. The Bishop of the Greek Catholic Church united with Rome having jurisdiction in this area, has selected a pastor approved by the plaintiffs; the defendants, following a vote by the congregation, have selected another. The suit is brought to restrain the defendants from interfering with the occupancy and control by the pastor selected by the Bishop of the parish house, church edifice and other church property.

The defendants are trustees of the church, selected in accordance with the corporate by-laws. " The trustees of every religious corporation shall have the custody and control of all the temporalities and property, real and personal, belonging to the corporation and of the revenues therefrom, and shall administer the same in accordance with the discipline, rules and usages of the corporation and of the ecclesiastical governing body, if any, to which the corporation is subject * * *." (Religious Corporations Law, § 5.)

If this church is subject to the rules of the Roman See and under the control of the Pope, plaintiffs' contentions are well founded, as the defendants acting as trustees are not administering the affairs of the church in accordance with the requirements of the ecclesiastical governing body. Upon the other hand, if the church was organized and has been conducted without affiliation with Rome, and is an independent body, plaintiffs have no standing in court. (*Matter of First Presbyterian Society of Buffalo*, 106 N. Y.

251; *Westminster Church* v. *Presbytery of N. Y.*, 211 id. 214; *Trustees of Presbytery* v. *Westminster Church*, 222 id. 305.)

The term " Greek Catholic " is generic and may signify either a church (1) united with Rome, (2) organized under a hierarchy independent of Rome (formerly under the Russian Synod) or (3) independent, under the sole jurisdiction of a corporate body or patriarch. Each uses substantially the same liturgy, service and discipline, derived generally from the Eastern or Byzantine Church which dates from the schism of Constantinople in 1054. The services of all three types are conducted in the Slavonic language native to the parishioners or their ancestors who came to America from the region of the Carpathian Mountains, beginning about 1880. Before the incorporation of this church and congregation, a committee consulted an attorney in Binghamton. The evidence given by the surviving members of the committee does not vary substantially from that given by him, which I quote: " I asked them if it was the Russian Orthodox and they said, ' No, they were associated with the Roman Catholic Church.' I said to them then, ' If that is so, of course, you will have to incorporate as a Roman Catholic Church and obtain the consent of the bishop. The Vicar General and the pastor and two laymen would be the trustees.' They said ' no ' they did not want this at all; that they did not want any bishop to control their affairs, that they wanted it so incorporated that their affairs would be controlled by them free from the control of any agency outside of their own local organization. That was the substance of the conversation. * * * I told them at the time that if they wanted it that way, to have control of their own affairs so that there would be no outside agency in any way controlling them or interfering with their property matters, or their affairs, the thing to do would be to form it under the Membership Corporation Law. * * * They told me to go ahead and prepare the certificate which I subsequently did."

" Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." (U. S. Const. First Amendt.) Justice Field wrote in *Davis* v. *Beason* (133 U. S. 333, 342); " The term ' religion ' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will. It is often confounded with the *cultus* or form of worship of a particular sect, but is distinguishable from the latter. The first amendment to the Constitution, in declaring that Congress shall make no law respecting the establishment of religion, or forbidding the free exercise thereof, was intended to allow everyone under the

jurisdiction of the United States to entertain such notions respecting his relations to his Maker and the duties they impose as may be approved by his judgment and conscience, and to exhibit his sentiments in such form of worship as he may think proper, not injurious to the equal rights of others, and to prohibit legislation for the support of any religious tenets, or the modes of worship of any sect."

"The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this State to all mankind." (State Const. art. 1, § 3.) Former Presiding Justice VAN KIRK wrote in *Smith* v. *Donahue* (202 App. Div. 656, 660): "The State has ever been zealous, since its organization, to protect against appearance of an encroachment upon the right of free worship of God as the conscience of the citizens may choose and direct." The worshippers who founded this church may well have cherished traditions originating with Constantine, the first Christian Emperor of the Roman Empire, to whom is credited the authorship of the Edict of Milan, issued in 313 A. D., granting "both to the Christians and to all others free power of following whatever religion each may have preferred. * * * The absolute power is to be denied to no one to give himself either to the religion of the Christians, or to that religion which he thinks most suited to himself." The testimony is undisputed that the founders intended to form an independent Greek Catholic church, not united with Rome. In this they were well within their rights.

Plaintiffs assert that this congregation, subsequent to the incorporation, has been so conducted that now it is a Uniate church, *i. e.*, one united with Rome and subject to control by local ecclesiastical authority representing the Vatican. Bishop Ortinsky, a Uniate Greek Catholic Bishop residing in Philadelphia, came to Binghamton in 1907 and dedicated the edifice owned by this congregation. He requested that the property be conveyed to him in compliance with the requirements of the Vatican for a Uniate church. This request was refused by the members of the corporation and congregation. The dedication by a Uniate Bishop is regarded as significant by the plaintiffs. Any inference which this might justify is refuted by the refusal to convey the property when requested to do so, and by the fact that the Bishop accepted $100 for the dedication ceremony, the canon law forbidding that money be accepted for the dedication of a Uniate church.

Eleven priests or pastors served this congregation before the disagreement out of which this litigation arose. Much testimony was given, hearsay and otherwise, concerning their affiliation or

lack of affiliation with Rome. A majority probably were so affiliated, but some were not. In no instance did the Bishop appoint or designate a priest for service until after he was approved by the parishioners following a try-out. The congregation always reserved the right to fix the salary, to increase or reduce it, and to terminate the pastorate. The saying of prayers for the Pope and Bishop by a Uniate priest was to be expected, and would not offend any right-thinking churchman, of Catholic, Protestant or unclassified denomination. Collections known as the Cathedraticum were taken in the church and forwarded to the Bishop, as were Peter's Pence for the Vatican. There were intervals of several years when these collections were not taken. A reasonable explanation is that priests united with Rome would advocate these collections and, if the congregation was in sympathy with the individual priest, frequently the suggestion would be adopted. The rites are markedly similar, if not identical, in character in Greek Catholic churches, whether independent, Russian Orthodox or united with Rome. Therefore, proof as to the performance of the mass and the administration of the sacraments in accordance with the rites of the Uniate church is without significance.

It was for the Bishop, after such consultation with his superiors, if any, as he deemed necessary, to determine whether or not he would recommend a Uniate priest for the consideration of this independent congregation. His act in this particular did not affect the independence of the church corporation.

An exhaustive opinion was written by the official referee (HINMAN), and findings in great detail were made. I do not feel, in view thereof, that more discussion is necessary. Nothing was proven which affected the right of this church and congregation to continue as it began, an independent Greek Catholic church, without affiliation with Rome or with the successor or successors of the Russian Synod.

The judgment should be affirmed, with costs.

CRAPSER, BLISS, SCHENCK and FOSTER, JJ., concur.

Judgment affirmed, with costs.