[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for a temporary injunction. The plaintiff is Pentecostal Church of God I.M. of New Haven Incorporated. It is a religious corporation organized under the laws of the State of Connecticut. The defendants are Pentecostal Church of God International Movement, Luis Felipe Rosa, Pedro Rosario Fernandez, Manuel Aldarondo, Javier Perez, Andrea Pedraza, Iris Santiago, and Julia Diaz. In its application for temporary injunction, the plaintiff claims that the defendants have ousted the legal membership of the plaintiff from and refused to permit plaintiff's pastor or members entrance to their church building. By way of relief, the plaintiff seeks an order of the court, "enjoining Defendants, their agents, servants, members and employees from entering Plaintiff Church; from conducting, calling or advertising meetings at Plaintiff Church; or using, disposing or transferring the assets or funds in the Church's bank account."
"In general, a court may, in its discretion, exercise its equitable power to order a temporary injunction pending final determination of the order, upon a proper showing by the movant that if the injunction is not granted she will suffer irreparable harm for which there is no adequate remedy at law. Tomasso Bros., Inc. v. October Twenty-Four, Inc.,230 Conn. 641, 648, 646 A.2d 133 (1994); Walton v. New Hartford,223 Conn. 155, 165, 612 A.2d 1153 (1992); Berin v. Olson, 183 Conn. 337,340, 439 A.2d 357 (1981). "In exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." Moore v. Serafin,163 Conn. 1, 6, 301 A.2d 238 (1972)." Moore v. Ganim, 233 Conn. 557,616, 660 A.2d 742 (1995).
Based upon the credible evidence presented, the following facts are found. CT Page 16412
The defendant, Pentecostal Church of God International Movement (hereinafter "Movement") according to its by-laws' historical review, is an evangelical Christian church that finds its roots in missionary work dating back to 1916. It was originally organized in Puerto Rico; it now has churches established throughout the western hemisphere, Europe and Australia.
Angel L. Sanchez was ordained as a minister in the Pentecostal Church of God International Movement, Inc. in 1987. Prior to that he had been ordained in a ministry he referenced as the Church of God. In May, 1987, he formed the plaintiff church, Pentecostal Church of God I.M. of New Haven. In February, 1989, that church was incorporated as a religious corporation named Pentecostal Church of God I.M. of New Haven, Incorporated (hereinafter "local church"). The corporators were Angel L. Sanchez, Diana Sanchez, and Esteba Rosardio. Notice of meetings was, by practice, posted in advance outside the front of the church building. Only active members vote on matters of the church. Decisions are made by majority vote of those present. Until the events that precipitated the conflict before the court, Angel Sanchez was continuously the pastor of the local church. Membership in the local church is achieved by a sequential process of first taking classes, baptism and then the pastor presents the individual to the congregation and the congregation accepts the person as a member.
The local church is associated with the defendant Movement and has been since the formation of the local church. The local church, however, has never taken any action to accept the bylaws or any other regulations of the Movement as binding on them. The local church did, for at least the last three years, and for a period of time prior to that which was not established in the evidence, account monthly to the Movement for all funds received and disbursed by the local church. Also, the local church sent to the regional treasurer of the Movement monthly sums representing tithings for the pastor, Bible school and general funds. Funds were also sent for missionary work. The funds were sent' consistently, but not without some interruption, to one fund or the other. The pastor's tithing was not sent by the local church itself after some time in 1999.
Pastor Sanchez, and at times other members of the church, attended meetings of the Movement. Sanchez had a copy of the bylaws and constitution of the Movement. He was nominated to be on, and accepted, positions of leadership within the of the Movement: on July 31, 2000, he was named a member of the Resolution Committee of the 2000 Regional Convention of the Movement; in 1994 he was invited to lead the devotional at the annual meeting of the Regional Convention; in August, 2000, Sanchez was elected as sub-director of the Department of Mission and Evangelism of the Eastern Region of the Movement. CT Page 16413
The local church has purchased real estate in two different transactions. In the first transaction the local church acquired several properties through a foreclosure auction. For $26,000.00, on October 18, 1993, the local church acquired 551 Columbus Avenue, 24 Downes Street and 866 Congress Avenue aka 555 Columbus Avenue, all in New Haven. The local church took title in the first series of transactions as Inglesia de Dios Pentecostal, Inc. In the second transaction, title was taken as Iglesia de Dios Pentecostal Getsemani aka Pentecostal Church of God in purchases from the City of New Haven in February, 1998. The purchase price paid by the local church to New Haven was $2,411.50 for 541 Columbus Avenue, and $1,453.50 for 20 Downes Street, both in New Haven. All of the properties, taken together, provide contiguous lots containing a church building, parking, and a parsonage. The local church purchased these real estate properties with funds raised from the membership of the community. After the purchase of the property in 1993 some renovations were made to the real estate. After the purchase of the parcels in 1998, extensive renovations were committed to the property. Members of the local church worked on the premises and the church spent over $300,000.00 on renovations. The Movement did not contribute anything to the purchase or renovation of the real estate. It did provide a loan of $30,000 which was being paid off on a monthly basis by the local church until the events that spawned the controversy before the court presently. Sometime at or around 1999, Pedro Rosario spoke with Sanchez about "the papers for the property purchased' inferring that he wanted the title to the real estate in the name of the Movement; Sanchez informed Rosario that he would have to discuss this with the local church membership. The local church membership considered the issue and voted not to give title of the real estate over to the Movement.
The balance of the necessary funds to purchase and renovate the real estate were raised from the parishioners. One member, Iris Santiago, lent the church funds in the amount of $39,000 toward the renovations. Ms. Santiago was voted the treasurer of the local church by the membership in 1998. She remained in that capacity until January, 2001 when she resigned as a member of the local church. As treasurer, she prepared monthly financial reports of the local church on Movement forms and filed them monthly with the Movement, as well as sending local church contributions to the Movement for various functions. On January 22, 2001, when the Movement came and took over physical possession of the local church property, on behalf of the Movement, she closed the local church bank accounts and put them in the name of the Movement and she paid off the loan from herself from those funds. Until that time, the loan to her had been paid by the local church monthly.
On January 16, 2001, Manuel Aldarondo of Waterbury, who is a pastor CT Page 16414 ordained by the Movement and an official within the Movement, was asked by the Movement Regional President to visit Angel Sanchez. The Movement had received telephone calls from members of the local church that something wrong was occurring with Sanchez at the local church-that he was conducting him self in an immoral manner. With Aldarondo and Sanchez, at the meeting, was Rev. Felipe Rosa, a presbyter (higher official) of the Movement, and Rev. Rafael Vasquez, a pastor in the Movement who had originally been from the local church community. At that meeting, Aldarondo confronted Sanchez with information that he had sinned. Sanchez acknowledged it and said he could not continue as pastor of the local church. Aldarondo recommended to Sanchez that he submit his resignation as pastor in writing, that he hand in his Certificate of Communion and his keys to the church, and, that he had an obligation to explain his situation to his family. The meeting ended.
Subsequent to that meeting, events unfolded that brought the parties to the present postures of litigation. Representatives of the Movement came to the local church and held three meetings in one week in the church, on the Tuesday, Thursday and Friday of that week. Sanchez sought to join the first meeting but Felipe Rosa and Pedro Rosario of the Movement told him that there was no reason for him to be there and turned Sanchez away. At these meetings, members of the local church had told Pedro Rosario and other Movement representatives that they wanted Sanchez, their pastor there. Rosario told them no, that Sanchez had been voted out as pastor. At the Thursday meeting, Ariel Torrez addressed the local church members. He was there to represent the Council of the Movement. Once again he was asked why their pastor, Sanchez could not come in. They were told that Pedro Rosario would be there the next day to address their concerns. On Friday Rosario came to the church to address its members. Rosario told the local church members that the Movement Council was now controlling the church money and held the power of the church. The Movement representatives were accompanied at these meetings by individuals unfamiliar to the local church members. These strangers sat in the rear of the church away from the membership. They dressed and looked aggressive and violent. The church members who testified were intimidated by these individuals' aggressive appearance at these meetings. At the last two of the meetings, police officers were outside the church in their vehicles. At the meetings, regional representatives of the Movement addressed and were addressed by the local church membership. The local church was told that Sanchez was no longer their pastor and the Movement would be appointing a new pastor and would be running the church. The church membership protested these assertions by the Movement representatives but they were told they could leave if they did not like it.
In large numbers, they left because they were peaceable and were CT Page 16415 intimidated by the aggressive looking individuals at their meetings supporting the Movement representatives. There were six representatives of the Council of the Movement at these meetings.
The local church had numbered about 98 members, active and inactive, before this controversy. Those that left number about 55 members. They are now holding church services at 105 Derby Avenue. They share a church with an `American' church. They hold services on days that are not traditional for them but an accommodation to work around their host church. They pay rent of $400 per month to use the church at 105 Derby Avenue. Sanchez and his family also moved out of the local church parsonage at 866 Congress Avenue. Sanchez had received a note from the Movement to leave and so he and his family vacated the home at the end of February, 2001.
Angel Sanchez submitted his resignation as pastor of the Pentecostal Church of God, Getsemani in writing. The resignation letter is not dated. He submitted it shortly after he was barred from entering the church to save the local church community and his family more pain. The local church never asked Sanchez to resign as pastor. The membership of the local church ultimately voted to not accept the resignation of Sanchez. He continues as their pastor.
In hopes of coming to a solution to being out of their church and deprived of its use or the use of their own funds, a couple of members of the local church proposed to the membership that they submit a petition to the Council of the Movement that Rafael Vasquez be appointed their pastor. Those suggesting the petition did not acknowledge the power of the Movement over them, but felt "their backs were against the wall' and that, since they respected Rafael Vasquez, if he was picked as pastor by the Movement, they could live with him as a choice and, that way, they could get back to their church. The cover letter indicated that petitions with signatures of 34 families were included and that there were 49 families in the congregation, of which 57 were adults (who have 33 children). The Movement did not appoint Vasquez as its choice for minister. It appointed Hector Rivera, who has been the pastor at the local church building, holding services for those who remain at the building. It is not clear how many parishioners or members this represents. The petition signatures that were gathered, as referenced above, represent a clear majority of the membership as it was counted.[1]
The only other gauge available is the offerings and income submitted monthly to the Movement; they are significantly lower than before the January, 2001 events.
The plaintiff is seeking injunctive relief that will place it back into the buildings owned by it and restore its funds to it. The defendants CT Page 16416 assert that the Movement is properly in possession of the assets of the local church and that the plaintiff members who have left the premises have no right to their possession. There is well developed law in Connecticut, and indeed, throughout the common law, on the secular, judicial determination of the ownership and right to possession of church assets where a schism has occurred.
The authority of a state court to adjudicate matters such as this has been settled. In a matter before the United States Supreme Court where the entitlement to ownership of certain church property was at issue, the high court ruled that state courts were permitted to resolve such an issue. "The only question presented by this case is which faction of the formerly united Vineville congregation is entitled to possess and enjoy the property located at 2193 Vineville Avenue in Macon, Ga. There can be little doubt about the general authority of civil courts to resolve this question. The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively.Presbyterian Church I, 393 U.S., at 445. It is also clear, however, that "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." Id., at 449. Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. Serbian Orthodox Diocese v. Milivojevich, 426 U.S. 696, 710
(1976); Maryland Va. Churches v. Sharpsburg Church, 396 U.S. 367, 368
(1970); Presbyterian Church I, 393 U.S., at 449. As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization. Serbian Orthodox Diocese,426 U.S. at 724-725; cf. Watson v. Jones, 13 Wall. 679, 733-734 (1872). Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, "a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." Maryland Va. Churches,396 U.S., at 368
(Brennan J., concurring) (emphasis in original)." Jones v. Wolf,443 U.S. 595, 603-4 (1979).
"Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property CT Page 16417 disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, Abington School Districtv. Schempp, 374 U.S. 203 (1963); the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions. Presbyterian Church v. Hull Church, 393 U.S. 440,445-6 (1969).
In Connecticut, the Supreme Court has established an approach to these matters that requires no consideration of doctrinal matters. "Because disputes involving church property have arisen with unfortunate regularity, there are well-developed guidelines for us to follow in the application of neutral principles of law. The basic rules, laid down inWatson v. Jones, supra, establish a two-stage test. If property is dedicated by way of an express trust either to the general or to the local church, the terms of the trust will be enforced. In the absence of an express trust, the court must determine ownership of the property on the basis of the polity of the general and the local church: if the property is held by a local church which is independent of the general church, the property is subject to control by the decision of the majority of the local church; if, however, the property is held by a local church which is connected as a subordinate member to a hierarchical general church, then rights to the property are to be decided by the hierarchical church's superior ecclesiastical tribunal. Watson has been followed in this state in Independent Methodist Episcopal Church v.Davis, 137 Conn. 1, 13, 74 A.2d 203 (1950), and in Trustees of TrinityMethodist Episcopal Church v. Harris, 73 Conn. 216, 224, 47 A. 116
(1900)." New York Annual Conference v. Fisher, 182 Conn. 272, 282,438 A.2d 62 (1980). In the instant matter, it is undisputed that there is no express trust existing. It is further undisputed that no express trust dedicated the real property and other assets at issue here.
"The rule is well-recognized that the title to church property of a divided congregation is in that part of it which is acting in harmony with its own law, and the ecclesiastical laws, usages, customs and principles which were accepted among it before the dispute began. RussianCT Page 16418Orthodox Greek Catholic All Saints Church v. Kedrovsky, 113 Conn. 696,704, 156 A. 688. The opinion of Lord Eldon in Attorney-General v.Pearson, 3 Mer. 353, 400, 36 Eng. Rep. R. 135, is often cited to the effect that it is the duty of the court to decide in favor of those, whether a minority or a majority of the congregation, who are adhering to the doctrine professed by the congregation and the form of worship in practice, as also in favor of the government of the church in operation with which it was connected at the time the trust was declared. GreekCatholic Church v. Orthodox Greek Church, 195 Pa. 425, 434, 46 A. 72;St. Michael's Ukrainian Greek Catholic Church v. Bohachewsky, 60 R.I. 1,20, 196 A. 796." McAuliffe v. Russian Greek Catholic Church, 130 Conn. 521,527, 36 A.2d 53 (1944).
The question posed here, to the court, is similar to that in the matter of Independent Methodist Episcopal Church v. Davis, 137 Conn. 1, 12,74 A.2d 203 (1950): "This question is whether or not the subordinate facts legally and logically support the ultimate fact, expressed in various ways in the report, that, while the plaintiff church followed the spiritual guidance and leadership of the General Church, it reserved the right to control its own property and in this respect did not surrender its autonomy to the General Church. Liefeld v. Coffin, 103 Conn. 279,283, 130 A. 576; Practice Book 172." Here, the question is whether the plaintiff church followed the spiritual guidance and leadership of the Movement while reserving to itself the right to control its own property, and in this respect, thus not surrendering its autonomy to the Movement.
The Court in Independent Methodist Episcopal Church, supra, 13, stated the law: "From this it follows that, when a local church has associated itself with a general church to whose rule of matters temporal and spiritual it has submitted in conformity with prescribed requirements for such affiliation, the members who sever relations with the general church, repudiate the higher authorities and establish an independent church are not entitled to take the church property with them. McAuliffecase, supra, 536; Kedrovsky case, supra, 704; Watson v. Jones, 13 Wall.(80 U.S.) 679, 734, 20 L.Ed. 666. If the members of a church founded upon the polity of local autonomy either as to ecclesiastical affairs or secular affairs or both seek to join a denomination in which the polity is episcopal or presbyterian, they are not permitted to take the property of the local church with them, at least against the objection of a minority. Property once dedicated to the use of a church of one polity may not be diverted to the use of a church of a different polity.Christian Church v. Church of Christ, 219 Ill. 503, 512, 76 N.E. 703;Kemp v. Lentz, 46 Ohio L. Abs. 28, 31, 68 N.E.2d 339."
From its inception, the founders of the plaintiff church and its CT Page 16419 membership community have conducted the affairs of the local church in accordance with their own customs and practice of governance. The local church has not ever, through its membership, accepted the control of the Movement or its by-laws or regulations. It has held its real estate in its own name and not submitted its control or title to the Movement. When the Movement requested title of the property to be turned to it, at a meeting and vote of the membership, this initiative was rejected.
The local church's participation in the Movement's regional conferences, the monthly financial accounting and contributions to the Movement, and the spiritual identity of the local church with the Movement through its name, denomination, and the Movement ordination of its pastor, Sanchez, do not in themselves determine the rightful outcome here. "That the church accepted the dogma of the denomination, followed its ritual, participated in its conferences and contributed to its support is not controlling. Malanchuk v. St. Mary's Greek CatholicChurch, 336 Pa. 385, 399, 9 A.2d 350; see Drozda v. Bassos,260 App.Div. 408, 23 N.Y.S.2d 544; Calkins v. Cheney, 92 Ill. 463,479." Independent Methodist Episcopal Church, supra, 15-16. The local church has always, from its inception, maintained its own independence in the holding of its property and the governance of its affairs; it has always perceived itself as an independent sovereign unit that had an association with the Movement in spiritual matters. Sanchez, an ordained minister of the Church of God, already had his local church formed before he sought to become ordained in the defendant Movement. When the local church was incorporated as a religious society it followed its own rules of governance, never adopting those of the Movement.
The court finds that the local church retained its sovereignty over its governance and control over its assets. It never surrendered to, or acknowledged the authority of the Movement over these issues. Accordingly, the court finds that it is likely that the plaintiff will succeed on the merits of the cause of action underlying the claims here for a temporary injunction. The relief that the plaintiff seeks, placing it back into rightful possession of the church property is purely equitable. There is no legal remedy that will suffice. The harm claimed by the plaintiff is the inability to worship at the church the plaintiff made for itself. The plaintiff has been supplanted from its church since January, 2001; it has been required to worship on nontraditional days to accommodate its place of temporary rental. On a recurring and continual basis, it has not had the use or enjoyment of the sanctuary it purchased, renovated and supported since its ownership. In balancing of the equities, the defendant Movement has not historically had a place of worship at the premises; its headquarters are in New York; those that represent the local church represent the majority of its membership, which is how it has historically governed itself; and, the defendant CT Page 16420 Movement has never been recognized by that majority membership, or controlling body of the local church as the hierarchal party in interest in the real estate. The local church has always recognized only itself as the owner and rightful occupant of the real estate; it has always governed itself by majority vote and the majority, representing the church itself has been ousted and seek to return to the church premises. The individual defendants are either regional representatives of the Movement or former local church members who have resigned their membership. Their dissension from this decision has resulted in their parting with the local church; however, they are not entitled to assert possession of the church assets when they have abandoned the local church's traditional and historical manner of governance and decision to retain Sanchez as their pastor.
The local church had assets of approximately $18,000 in bank accounts that the Movement has appropriated to itself when it took over the church property. Some of this money was used to pay the debt to Iris Santiago, in full or part. There has been no accounting to the plaintiff; by the defendants, of the use of the plaintiff's funds. These funds are the proceeds of collections and contributions from local church members. The local church is entitled to use of its own funds in the maintenance and ownership of its properties and the operation of its affairs.
The court orders:
1. The defendants shall quit occupancy of all of the plaintiff's real estate by 5 pm December 20, 2001. They shall turn over all keys to all of the buildings to a representative of the plaintiff at that time. All personalty in the premises shall remain. The defendant Movement is restrained from occupying said after said date and time. The individual defendants may enter said premises after said date and time only as the plaintiff church permits. The plaintiff is entitled to occupancy of the premises of all of its real estate as of 5pm December 20, 2001.
The real estate intended to be covered by this order are those parcels, with improvements thereon, acquired by the plaintiff in the deed found at volume 4706 page 147 in the Land Records of the City of New Haven, being 551 Columbus Avenue, 24 Downes Street and 866 Congress Avenue also known as 555 Columbus Avenue; and, in the deeds found at volume 5344 page 35 and volume 5345 page 001 in the Land Records of the City of New Haven, being 541 Columbus Avenue and 20 Downes Street, New Haven.
2. The defendant Movement shall turn over to the plaintiff such funds of the plaintiff that it put into its own bank accounts and shall provide a written accounting of all of said funds within 30 days of this order. CT Page 16421
By the Court Munro, J.